J-A04022-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| CHRISTIANA MARKLE, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| JEFFREY S. MARKLE, | |
| Appellee | No. 968 WDA 2014 |

Appeal from the Order of June 5, 2014
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s): 409 of 2011-D

BEFORE:  BOWES, OLSON AND STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                                    **FILED JUNE 22, 2015**

Appellant, Christiana Markle, appeals from the trial court's equitable distribution order dated April 4, 2014, as made final by the entry of the divorce decree on June 5, 2014.  Moreover, Jeffrey S. Markle (hereinafter "Mr. Markle") filed a motion to quash this appeal.  We deny Mr. Markle's motion to quash[1] and affirm the decree of divorce.

_____

[1] According to Mr. Markle, we must quash the appeal because Appellant filed her notice of appeal from the pre-divorce order of equitable distribution and not from the final decree of divorce.  Mr. Markle's Motion to Quash, 7/31/14, at ¶ 7.  Mr. Markle's claim is frivolous, given that a decree of divorce was entered in this case and Appellant filed her notice of appeal within 30 days from the entry of the final divorce decree. *See Campbell v. Campbell*, 516 A.2d 363, 366 (Pa. Super. 1986) (*en banc*) (holding that, even though a pre-divorce order of equitable distribution is an interlocutory order, this Court may review the order once "it has been rendered final by the entry of a decree in divorce"); *Busse v. Busse*, 921 A.2d 1248 (Pa. Super. 2007) *(Footnote Continued Next Page)*

*Retired Senior Judge assigned to the Superior Court.

On March 2, 2011, Appellant filed a complaint in divorce and requested, *inter alia*, that the trial court enter: a decree in divorce; an order equitably dividing the marital property; and, an order granting her counsel fees, costs, and expenses. Complaint in Divorce, 3/2/11, at 1-5. On December 29, 2011, Appellant filed an amended complaint in divorce, wherein Appellant re-pleaded the above counts. Amended Complaint in Divorce, 12/29/11, at 1-5. The trial court appointed a master to resolve the divorce, equitable distribution, and counsel fees, costs, and expenses claims. Trial Court Order, 12/28/12, at 1.

As the Master explained:

> [T]he Master affixed Thursday, April 11, 2013 . . . as the date . . . for a preliminary attorney's conference. Counsel for both parties attended the preliminary attorney's conference. The Master then scheduled a settlement conference for June 4, 2013. . . . Counsel for both parties appeared along with the parties to this action in divorce. At the settlement conference[,] the issues were clearly defined. Unfortunately, the action in divorce could not be settled and the Master then scheduled a hearing for Thursday, September 26, 2013. . . .
>
> [The Master made the following findings of fact after the September 26, 2013 hearing:]

*(Footnote Continued)* ─────────────────

(same); *see also **Betz v. Pneumo Abex, LLC***, 44 A.3d 27, 54 (Pa. 2012) ("an appeal of a final order subsumes challenges to previous interlocutory decisions"); ***Stout v. Universal Underwriters Ins. Co.***, 421 A.2d 1047, 1049 (Pa. 1980) ("[t]he Rules of Appellate Procedure were adopted to insure the orderly and efficient administration of justice at the appellate level. They were not intended, however, to be so rigidly applied as to result in manifest injustice, particularly when there has been substantial compliance and no prejudice"). Therefore, we deny Mr. Markle's motion to quash.

**1. Marriage**

The parties were married on November 2, 1991. The parties resided together for some time following the filing of the complaint in divorce. Counsel stipulated the date of separation was in August [] 2008. . . . [Appellant] was born [in September 1969] and is now 44 years old. [Mr. Markle] is 45 years old.

**2. Residence**

The last marital residence of the parties was at 301 East Church Street, Ligonier, Pennsylvania. [Appellant] still resides at the marital residence while [Mr. Markle] now lives at 154 Monarch Lane, Ligonier, Pennsylvania. The parties have lived in the Ligonier area since the date of their marriage. The parties began living at the Church Street residence in Ligonier in [] 1994.

**3. Children**

The parties are the parents of three children, one of which, Emma[,] is a [17-year-old] minor and resides with [Appellant]. Their daughter Catherine is in college at East Carolina University[,] while their son, Owen, is 21 years old and lives in Wilpen, Pennsylvania.

**4. Health**

Neither party testified about any health problems and the Master will presume that they are in good health.

**5. Educational Background**

[Appellant] received a [bachelor of arts] in elementary education and a [master's] degree in community counseling through a program with Duquesne University. [Mr. Markle]

received a degree in finance from the University of Pittsburgh, Johnstown[,] in 1990.

## 6. Earnings and Earning Capacity

[Appellant] is employed as a Regional Director of Children's Services with NHS Human Services. In 2011 and 2012[, Appellant] earned approximately $63,000.00 per year. [Mr. Markle] is employed at the Smail Company [], a car dealership[,] as the Manager of Secondary Finance. [Mr. Markle's] 2012 W-2 indicated that [he] earned approximately $156,000.00 [in 2012]. In 2011[, Mr. Markle] earned $130,899.81. [Appellant] does not receive alimony *pendente lite*. However, [Mr. Markle] pays [Appellant] $894.00 [per month] as support for their 17 year old daughter, Emma.

## 7. Vocational Skills and Employability

The Master finds that [Appellant] has sufficient vocational skills to remain a Clinical Counselor or a Supervisor of Counseling Services. [Mr. Markle] is also employed by Kia Motors and is paid on a commission basis and receives a 1099. He has been employed by the same company for 17 years and the Master assumes that he has sufficient vocational skills to continue and be employed in the car financing business.

## 8. Debts and Liabilities of the Parties

The parties have a line of credit on the marital residence with Citizens Bank with a payoff of approximately $55,147.00. There is also a mortgage with Westmoreland Federal Credit Union with a payoff of $36,716.44. [Appellant] has a student loan with a payoff of approximately $4,700.00. [Appellant] testified that a large portion of the original loan balance was paid by [her and Mr. Markle,] out of their joint account[,] while they were residing together and prior to the date of separation. Following the date of separation, [Appellant] continued to make the payments on the student loan. Both parties

contributed to the joint account during the marriage. [Appellant's] income was increased along with her earning capacity as a result of her obtaining the master's degree. By obtaining the master's degree, [Appellant] is well able to support herself and assist with the support of the children. . . . Obtaining the master's degree helped both parties by increasing [Appellant's] income and lessening [Mr. Markle's] obligation to pay her support and alimony *pendente lite*. Therefore, the Master will consider the student loan payoff in the amount of $4,700.00 as a marital debt but to be paid by [Appellant]. [Mr. Markle] contributed significantly to the payment of the educational loan during the marriage. [Appellant's] counsel . . . indicated that his counsel fees are $21,027.90.

**9. Contributions by Either Party to the Other's Education, Training, and Earning Capacity**

[Mr. Markle] obtained his degree from the University of Pittsburgh, Johnstown in finance prior to the marriage. [Appellant] obtained a master's degree during the marriage and is still paying for her school loan. The cost for the master's degree was $25,000.00 to $28,000.00[,] some of which was paid from a joint marital account. [Appellant] still owes $4,700.00 on her school loan. The Master finds that both parties contributed to the payment of [Appellant's] school loans during the time they were living together. [Appellant] will continue to pay the balance of her school loan. By contributing to [Appellant's] obtaining a master's degree, both parties benefitted during the marriage because it increased the family's earnings.

**10. Opportunities of the Parties for Future Acquisition of Capital Assets and Income**

Both parties should be able to increase their income over the years. [Appellant] is limited in that her employer is government funded and the government must make funds available for any increase in her income. [Mr. Markle's] earnings are substantially [greater than Appellant's] and the Master believes that [Mr. Markle] will have a much greater opportunity to acquire assets and income.

## 11. Contributions of Either Party to the Acquisition of Marital Property

[Appellant] was employed as a substitute teacher during the early years of the marriage. She worked at Ligonier Valley Learning Center on a part-time basis at minimum wage. She then worked at the Ligonier Valley YMCA at minimum wage. In 1998, [Appellant] became involved in therapeutic child support on a part-time basis, working with autistic children. [Appellant] now works with NHS Human Services as a regional director of children services earning almost $64,000.00 per year. Although [Mr. Markle] earns more than twice as much as [Appellant], the Master finds that the parties equally contributed to the acquisition of marital property. [Appellant] not only was employed during the marriage[,] but she should also be given credit as a housekeeper and wife. [Mr. Markle] also contributed significantly by repairing and improving the Church Street residence.

## 12. Standard of Living of the Parties During the Marriage and Economic Circumstances at the Time of Equitable Distribution

No evidence was presented concerning the standard of living of the parties but the Master believes based on their income that the parties enjoyed an upper middle class lifestyle. The parties have little debt. However, they are assisting the children in their pursuit of higher education.

## 13. The Value of Property Set Aside for Each Party

No evidence was presented regarding the value of the property set aside for each party.

## 14. Insurance

No evidence was presented regarding insurance other than real estate insurance with the Erie Insurance Company. . . .

The parties suffered roof damage to their Church Street residence and the Erie Insurance Company agree[d] to pay the parties $10,892.00 for hail damage to their residence. . . . The check has not yet been cashed or distributed and the Master will award the check for damages to the party awarded the residence.

## 15. Cost of Living

No evidence was presented regarding the cost of living of the parties but the Master is aware that monthly payments are owed on the mortgage of the marital property in which [Appellant] is residing.

## 16. Marital Property

There are several items of martial property[:]

a. [Appellant's] NHS Human Services 403(b) Plan - $53,035.15 as of March 31, 2012. On August 29, 2008[,] it was $23,053.28.

b. [Mr. Markle's] 401(k) with Smail Company[]. On August 1, 2008[, the 401(k) account was valued at $65,464.27 and on March 31, 2012[,] it was $104,718.73.

c. 1997 Ford Expedition valued at $760.00.

d. Ford Expedition 2008 driven by son with a retail value of $4,700.00

e. 2007 Kia Optima value of $6,575.00, owes approximately $4,500.00.

f. Real estate known as 301 East Church Street, Ligonier [(the marital residence)] . . .[:]

> [A]ppraised by Paul Sapotichne of Residential Real Estate Appraisers on behalf of [Appellant] on September 8, 2011 at $162,000.00. . . .

Appraised by DAX Martin Appraisal Services on August 12, 2013 [, on behalf of Mr. Markle,] at $197,000.00. . . .

[Mr. Markle] believes the house is worth $225,000.00. [Mr. Markle] bought and sold houses in the Ligonier area and was involved in the business of buying, repairing[,] and selling houses and believes that he is knowledgeable as to the value of houses. He stated he also checked the [prices] of neighboring properties [that were] sold. The real estate is subject to a line of credit with Citizens Bank[,] which[,] at the time of the hearing[,] had a balance of $55,147.00[,] and a mortgage with Westmoreland Federal Credit Union with a payoff as of the date of the hearing of $36,716.44, for a total [debt] of $91,863.44. . . .

The Master finds that the appraisal of DAX Martin Appraisal Services is the more recent appraisal and closest to the date of the Master's hearing and [the Master] therefore finds that the marital residence has a value of $197,000.00. . . .

After deducting the mortgage and line of credit, the Master finds that the house has [an] equity of $105,000.00. . . .

[Mr. Markle] testified that he performed approximately $4,000.00 worth of work on the marital residence following separation. [Mr. Markle] will be given credit for the work that he has done which will reduce the net equity in the home to $101,000.00.

g. Personal property including tools, guns, [three] Polaris quads, [Appellant's] jewelry, household furniture[,] and equipment.

h. One half of the proceeds from the sale of [the] Mill Creek property, $14,180.00.

i. Check from Erie Insurance Company for damages to the marital residence in the amount of $10,892.00.

**17. Custodian of Dependent Minor Children**

There is one minor child of the parties[,] namely Emma Markle[,] age 17[,] who resides with [Appellant]. [Appellant] receives child support payments in the amount of $894.00 [per month]. Emma is a senior in high school and will attend college in the fall of 2014.

Master's Report and Recommendation, 12/9/13, at 1-9 (some internal capitalization omitted).

After arriving at the above factual findings, the Master: awarded Appellant 53% of the marital estate and awarded Mr. Markle 47% of the marital estate; awarded Mr. Markle the marital home; awarded Appellant $4,500.00 in attorneys' fees; and, with respect to a joint bank account with a closing balance of $28,359.27, concluded that $14,180.00 from that account was marital property. The Master arrived at these equitable distribution awards and determinations by reasoning as follows:

Counsel for the parties were able to stipulate to the value of many of the items which consist of marital property. The main area of contention appears to be which of the parties will be awarded the marital residence known as 301 East Church Street, Ligonier, Pennsylvania. [Mr. Markle] would like the property for the reason that he spent many hours [] repairing and remodeling the home[,] including redoing the ceiling, rewiring the house, installing walls, rebuilding the master bedroom, installing hardwood floors in the children's room, installing shelves, building cabinets, building closets, replacing doors, installing stone, and [re-siding] the house. [Mr. Markle] indicated that he did 90% of the work with his son as a helper. . . . It is obvious that [Mr. Markle] has a strong attachment to the house and [he] indicated that he would never agree to sell the house. . . .

[Appellant] also has a very strong attachment to the house. She [testified that] the house was purchased from her father in 1995. [Appellant] also testified that the house is

in need of repairs, including a new hot water tank and a bigger furnace. The living room and dining room area needs cabinet and woodwork completed. She also stated that the back wall is rotten, the foundation is crumbling and the house floods on occasion. [Appellant's] father lives at 300 Summit Avenue, which is approximately [three] houses away from the marital residence. [Appellant's] father is 79 years old [and has] had a stroke and [a heart] valve replacement. [Appellant testified that she] would like to live close to her father [so that she is able to] check in on him []. [Appellant also testified] that [her father] stops by the marital residence every day when he is walking the dog. The Master is aware that both parties wish to be awarded the house, which in the Master's opinion prevented a settlement of this case.

The Master considered the testimony of both parties. [Appellant's] appraisal[, which was] performed by Paul Sapotichne, a [well-regarded] real estate appraiser, valued the house at $162,000.00 as of September 8, 2011. [Mr. Markle's] appraiser, DAX Martin House Appraisals[,] valued the marital residence at $197,000.00 on August 12, 2013. [Mr. Markle introduced evidence demonstrating] that he has a mortgage loan commitment to refinance the house if it is awarded to him. The commitment is from the Somerset Bank. . . .

Considering the work performed by [Mr. Markle] on the property and his ability to refinance the property[,] thereby removing [Appellant] from the two mortgages filed against the residence[,] the Master will recommend that the house be awarded to [Mr. Markle] at a value of $101,000.00[,] which represents the net equity in the marital residence after the payment of the mortgage, the line of credit[,] and a credit to [Mr. Markle] for work performed on the house after separation. The Master will further recommend that [Mr. Markle] refinance the property and remove [Appellant's] name from the mortgage and/or line of credit. Further, [Appellant] will be permitted to reside in the marital residence until July 1, 2014. [Mr. Markle] further indicated that he does not wish to sell the property and therefore the Master will not give him credit for the cost of sale. The Master believes by awarding [Mr. Markle] the real estate at his expert's valuation of $197,000.00 [Appellant]

will have sufficient cash in order to purchase a home based on her income. Further, it will not be necessary for [Appellant] to complete all of the repairs and upgrades which she testified need[] to be completed.

. . .

[Appellant] requested that she be awarded counsel fees. . . . [Appellant's] counsel, Mark Sorice, presented a detailed bill itemizing the time and fees involved in the divorce and equitable distribution [action]. [Attorney Sorice] presented a bill of $21,027.96, which did not include the time [he] spent on the Master's hearing. The Master will not consider the counsel fees regarding custody matters, but only for equitable distribution. It appears that [Appellant] filed several protection from abuse [petitions] and that there were significant harassment claims by [Appellant against Mr. Markle,] for which [Attorney Sorice] expended a great deal of time. . . .

The Master will award $4,500.00 to [Appellant in counsel fees]. . . . The Master notes that both counsel were very well prepared and saved a significant amount of time and money by agreeing on values and stipulating which items were marital property. . . . [I]t should be noted that some of [Appellant's] counsel fees were necessitated because of [Mr. Markle's] failure to comply with various orders.

[With respect to the joint bank account with a closing balance of $28,359.27, the proceeds in the bank account stemmed from the sale of real estate known as "the Mill Creek property." The Mill Creek property was originally purchased by Appellant, Mr. Markle, and] Mr. Markle's [brother-] and sister-in-law, Todd P. Markle and Karen M. Markle. . . . [In November 2009, the Mill Creek property was sold by the parties to] Vincent Brozack [and Mr. Brozack's wife]. . . .

The testimony and exhibits indicate that the net proceeds from [the sale of the Mill Creek property was] $112,737.[9]1. [Mr. Markle] and Todd Markle each took $40,000.00 and [Mr. Markle] testified that his $40,000.00 was used to pay down the balance on the Citizens Bank line of credit [on the marital residence]. The remaining balance

- 11 -

of the proceeds of the sale of the Mill Creek property, $32,737.91 was deposited by [Mr. Markle] in an account at Citizens Bank in November or December of 2009 and was ultimately withdrawn by [Mr. Markle] on August 22, 2012[,] when the Citizens Bank account was closed. At the time the bank account was closed it had a balance of $28,359.27. [Mr. Markle] testified [that] the original balance was reduced because Citizens Bank had taken money from the account to make the interest payments on the home equity line of credit [on the marital residence]. . . .

Mr. Markle and his brother testified that they have not been able to determine what their individual[] shares of this money should be since they have not had access to the bills, invoices, receipts, etc. from the Mill Creek property sale. They anticipated they would simply split the balance remaining in this account [equally,] as they did with the $80,000.00 [from the] sales proceeds in November [] 2009. . . .

The Master finds that the marital portion of the amount withdrawn by Mr. Markle in August [] 2012 to be approximately $14,180.00[,] which is approximately one half of the amount in the account when it was closed.

. . .

[Mr. Markle] had a 401(k) plan with his employer, Smail Automotive[,] which had a value of $65,464.20 at or near the date of separation on August 20, 2008. His 401(k) had a value of $104,718.73 as of March 31, 2012. [Appellant] had a [403(b)] through her employer which had a value on August 29, 2009 of $23,053.28 and a value of $53,335.15 as of March 31, 2012. . . . [Appellant is awarded] $50,000.00 by virtue of a QDRO from [Mr. Markle's] 401(k) at his place of employment. The QDRO shall be prepared by [Mr. Markle's] attorney as soon as possible after the entry of a decree. If [Appellant] chooses to retain this amount in a manner that will result in any income tax[] consequences[,] she will be solely responsible to pay said income tax or reimburse [Mr. Markle] for the same.

- 12 -

Master's Report and Recommendation, 12/9/13, at 10-19 (some internal capitalization omitted).

On December 23, 2013, Appellant filed exceptions to the Master's Report and Recommendations. Within these exceptions, Appellant claimed that the Master erred when he: 1) refused to award her the marital home; 2) failed to accept her expert's valuation of the marital home; 3) "ignor[ed] the damage to the roof" and "provid[ed] [Mr. Markle] $4,000.00 in credits as an off-set toward the total value of the marital home;" 4) concluded that "only $14,000.00 of the remaining $28,000.00 [in the joint bank account were] marital funds;" 5) "fail[ed] to take into consideration the nature and extent of the qualified assets awarded to [Appellant]" – specifically, when he "failed to consider" the fact that Appellant could not liquidate the $50,000.00 that was assigned to Appellant from Mr. Markle's retirement account without Appellant incurring "a great economic disadvantage;" and, 6) awarded her only $4,500.00 in attorneys' fees. Appellant's Exceptions, 12/23/13, at 1-2.

The trial court heard argument on Appellant's exceptions and, in an opinion and order dated April 4, 2014,[2] the trial court denied Appellant's exceptions and accepted the Master's Report and Recommendation. Trial Court Opinion and Order, 5/30/14, at 1-11.

_____

[2] Although the trial court's opinion and order was dated April 4, 2014, it was not entered until May 30, 2014. Trial Court Opinion and Order, 5/30/14, at 1-11.

On June 5, 2014, the trial court decreed that Appellant and Mr. Markle were divorced from the bonds of matrimony and, on June 12, 2014, Appellant filed a timely notice of appeal from the divorce decree. Appellant now raises the following claims to this Court:

> [1.] Considering [Appellant's] income, [Appellant's] exclusive occupation of the marital home as a residence for herself and her two youngest children, the unique circumstances of acquisition, [Appellant's] contact with the neighborhood[,] and the contributions made by [Appellant] in raising the parties['] three children in the marital home, was it error to award [Mr. Markle] the marital home?

> [2.] Was it error by the Master to ignore stipulated damage to the marital home and provide credits to [Mr. Markle] where no evidence existed to substantiate that these credits provided [an] increase in valuation and furthermore[,] was it also error for the Master to recognize the ability and experience of [Appellant's] appraiser, over [Mr. Markle's,] and not provide the reason for his choice in valuation?

> [3.] Was it error by the Master in creating a great economic disadvantage for [Appellant] by failing to consider within his distribution[] the nature and extent of the qualified assets awarded to [Appellant], the [parties'] standard of living, [Appellant's] reduced earning capacity compared to [Mr. Markle,] and the tax implications associated with the qualified plan?

> [4.] Was it error for the Master to recognize only $14,000.00 of the total sum of $32,837.43 deposited in the joint account of [Appellant] and [Mr. Markle] as marital property where it remained there for [two-and-a-half] years in the absence of any concrete evidence to rebut this presumption?

> [5.] Was it error by the Master in only awarding $4,500.00 in attorney[s'] fees to [Appellant's] counsel considering [Mr. Markle's] income of approximately $156,000.00 which is double that of [Appellant] and [the] Master's indication that

[Appellant's] fees were necessitated because of [Mr. Markle's] failure to comply with various orders?

[6.] Does a decree in divorce render a previous order regarding equitable distribution a final order for appeal purposes?

Appellant's Brief at 3-4 (some internal capitalization omitted).[3]

"When reviewing the actions of a lower court in a divorce action, we are limited to a determination of whether there was an abuse of discretion. Although the master's report is entitled to great weight, the final responsibility of making the [property] distribution rests with the court." *McNaughton v. McNaughton*, 603 A.2d 646, 648 (Pa. Super. 1992) (internal citations omitted). "Our review is thus based on the [trial] court's distribution of property." *Id.* However, even though a master's report and recommendation is only advisory, it "is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master ha[d] the opportunity to observe and assess the behavior and demeanor of the [witnesses]." *Childress v. Bogosian*, 12 A.3d 448, 455 (Pa. Super. 2011) (internal quotations and citations omitted).

In fashioning an equitable distribution award, the trial court must split the property equitably, rather than equally. *Drake v. Drake*, 725 A.2d 717, 721 (Pa. 1999). To do so, the trial court is required to "consider all relevant

_____

[3] We have already concluded that a final order has been entered in this case and that we have jurisdiction over this appeal. *See supra* n.1. Hence, we will not separately consider Appellant's sixth numbered claim on appeal.

factors," including:  the length of the marriage; any prior marriages of either party; the age, health, station, skills, and employability of the parties; the contribution by one party to the education, training, or increased earning power of the other party; the relative opportunities each party has to acquire future assets and income; the relative sources of income for each party; the role each party played in either building or dissipating marital property ("including the contribution of a party as homemaker"); the value of each party's separate property; the standard of living established during the marriage; the economic circumstances of each party at the time the division of property is to become effective; the tax ramifications associated with the distributed assets; the expense to sell, transfer, or liquidate a particular asset; and, whether the party will be serving as the custodian of a dependent minor child.  23 Pa.C.S.A. § 3502(a)(1)-(11).

The above list is not exhaustive.  *Gaydos v. Gaydos*, 693 A.2d 1368, 1376 (Pa. Super. 1997).  As we have explained:

> there is no simple formula by which to divide marital property.  The method of distribution derives from the facts of the individual case.  The list of factors of section 3502(a) serves as a guideline for consideration, although the list is neither exhaustive nor specific as to the weight to be given the various factors.  Thus, the court has flexibility of method and concomitantly assumes responsibility in rendering its decisions.

*Id.* (internal quotations, citations, and corrections omitted).

As is evident from the above, the trial court must be granted discretion to consider and weigh the innumerable facts and factors that are relevant to

- 16 -

its final equitable distribution award. In following, when reviewing the trial court's equitable distribution order, "our standard of review is limited, and we will not disturb the trial court's decision absent an abuse of discretion or error of law which is demonstrated by clear and convincing evidence." *Gilliland v. Gilliland*, 751 A.2d 1169, 1171 (Pa. Super. 2000) (internal quotations and citations omitted). "An abuse of discretion occurs when a trial court, in reaching its conclusions, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will." *Kelly v. Siuma*, 34 A.3d 86, 91 (Pa. Super. 2011) (internal quotations and citations omitted). Importantly:

> We do not evaluate the propriety of the distribution order upon our agreement with the court's actions nor do we find a basis for reversal in the court's application of a single factor. Rather, we look at the distribution as a whole, in light of the court's overall application of the 23 Pa.C.S.A. § 3502(a) factors for consideration in awarding equitable distribution. If we fail to find an abuse of discretion, the order must stand.

*Childress*, 12 A.3d at 462 (internal quotations, citations, and corrections omitted).

Appellant first claims that the trial court erred when it failed to award her the marital home. This claim fails.

At the outset, Appellant's claim is necessarily infirm, as it is singularly focused upon the distribution of one particular asset. As was explained above, "[i]n determining the propriety of an equitable distribution award, courts **must consider the distribution scheme as a whole**." *Biese*, 979

A.2d at 895 (emphasis added). Yet, with respect to Appellant's first claim on appeal, Appellant has not crafted any argument that the award of the marital home to Mr. Markle caused the "the distribution scheme as a whole" to be "manifestly unreasonable, or [that it was] the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." *Id.*

Nevertheless, we recognize that one spouse might have special needs and that, because of these special needs, equity might demand that the spouse remain in the marital home. *See*, *e.g.*, Brett R. Turner, 2 EQUITABLE DISTRIBUTION OF PROPERTY, 3d § 6:85 ("[i]n several different types of fact situations, one spouse will have a special need to remain in the marital home. . . . If no such need exists, there is no reason to treat the marital home differently from any other asset of the parties"). For example, a special need might exist where a spouse is disabled or where a spouse runs a business out of the home and where maintaining the home is necessary for the continuation of the business. *Id.*; *see also Hearst v. Hearst*, 883 N.Y.S.2d 875 (N.Y. Sup. 2007) (holding that the trial court did not err in awarding exclusive occupancy of the home to the husband where: the wife did not need to reside in the home, the husband was "in his 70s, in poor health[,] and uses a wheelchair," and the home had been recently renovated to accommodate the husband's disabilities); *In re Marriage of Craig*, 762 N.E.2d 1201 (Ill. App. 4 Dist. 2002) (holding that the trial court did not err in awarding the wife the marital home, where the wife "operates a day care

facility, licensed by the Department of Children and Family Services, from the home").

On appeal, Appellant essentially claims that the trial court's refusal to award her the marital home was erroneous, as the trial court failed to consider her special needs. Specifically, within the argument section of Appellant's brief, Appellant claims that the trial court should have awarded her the marital home because: she resides in the marital home "with her two children[,] Catherine and Emma[; and, at the time of the Master's hearing,] Emma [wa]s a minor;" her father lives three doors away; her father is sick and she "is actively involved within her father's life;" she "first spotted the marital home [when] she grew up in the neighborhood and was the principal party in making the arrangements for its purchase;" she currently resides in the marital home; and, Mr. Markle's salary "is more than double [Appellant's] salary" and Mr. Markle is thus "best able to purchase a new home with minimal disruption to his life or that of [Appellant] and [the] family." Appellant's Brief at 9-11.

Although we understand Appellant's desire to retain the marital home, none of Appellant's claimed needs demonstrate that the trial court's refusal to award her the marital home was "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." *Kelly*, 34 A.3d at 91. Certainly, with respect to Appellant's stated needs, we note that: no minor child currently lives in the home because, at the time of the Master's hearing, Emma was 17 years old

and, at this point in time, Emma is no longer a minor; during the Master's hearing, Appellant presented no evidence that – if she were forced to move – she could not still live near her father (by either moving into a home in the same or a close-by neighborhood or by moving away and having her father change his residence); Appellant's emotional attachment to the marital home and the neighborhood are not valid "special needs," which demanded that the trial court "treat the marital home differently from any other asset of the parties;" and, even though Mr. Markle's salary provided him with the ability to purchase a new home if necessary, there was no evidence that Appellant's substantial, $63,000.00-per-year salary precluded her from also obtaining a new residential home. Hence, the trial court did not abuse its discretion when it refused to award Appellant the marital home.[4, 5] Appellant's first claim on appeal fails.

_____

[4] We also note that, during the Master's hearing, Mr. Markle introduced a mortgage loan commitment from Somerset Bank, approving Mr. Markle for a loan in the amount of $147,750.00. *See* N.T. Master's Hearing, 9/26/13, at 19; Mr. Markle's Exhibit "H." Moreover, under the terms of the loan, the mortgage on the marital home and the home equity line of credit on the marital home would be paid off and Appellant's name removed from the subject mortgages. *See* Mr. Markle's Exhibit "H." During the hearing, Appellant did not introduce any evidence to demonstrate that, if she were awarded the marital residence, she had a similar ability to refinance the marital home and remove Mr. Markle's name from the mortgages.

[5] We further observe that, on May 21, 2012 and July 25, 2012, the Master convened a hearing to resolve the parties' cross-petitions for exclusive possession of the marital residence – and, after hearing Appellant's testimony, the Master arrived at the factual conclusion that Appellant was "**not interested in keeping the martial residence for herself as part of**
*(Footnote Continued Next Page)*

Next, Appellant claims that the trial court erred when it "provided a $4,000.00 credit to Mr. Markle for alleged work at the marital residence following separation." According to Appellant, since Mr. Markle did not present "the receipts, costs[,] or any documentation to support his claim of $4,000.00 in improvements," the trial court erred when it granted Mr. Markle the $4,000.00 credit. Appellant's Brief at 11. This claim fails. As the trial court explained:

> [Appellant] argues that the Master erred in providing a $4,000.00 credit to [Mr. Markle] for work that [Mr. Markle] completed on the marital residence after the date of

*(Footnote Continued)* ——————————

**the divorce proceedings**." Master's Report, 8/21/12, at ¶ 35 (emphasis added). Specifically, the Master concluded:

> 15. [Appellant] does not want to leave the home and move in with her father, who lives only three [] doors from the marital residence. She stated she has tried not to have her father involved with her divorce litigation. [Appellant] was ambivalent as to her keeping the house as part of equitable distribution. She explained that she was agreeable to keeping it because their children were attached to it, but was equally agreeable to sell the house as well. [Appellant] acknowledged that [Mr. Markle] wanted to keep the home and buy out her interest, but added that he also told her he was "keeping the kids."
>
> . . .
>
> 35. [Appellant] reiterated that she is not interested in keeping the marital residence for herself as part of the divorce proceedings, and that she only wants to stay where her children are.

Master's Report, 8/21/12, at ¶¶ 15 and 35.

separation. [Appellant] argues that [Mr. Markle] did not provide receipts, costs, or any documentation to support his claim of $4,000.00 in improvement, but [Appellant] provides no statutory or case law that requires [Mr. Markle] to provide such documentation for purposes of equitable distribution. [Appellant] did not cross[-]examine [Mr. Markle] regarding this issue although [Appellant] had the opportunity to do so and[,] based upon [Mr. Markle's] testimony, the Master gave [Mr. Markle] credit for the work that was done on the martial residence after the date of separation. [The trial c]ourt finds no error in the Master giving [Mr. Markle] a $4,000.00 credit for the work [Mr. Markle] performed after the date of separation. [Appellant's] exception with regard to the Master providing a $4,000.00 credit to [Mr. Markle] for work [Mr. Markle] completed on the marital residence after the date of separation is denied.

Trial Court Opinion, 5/30/14, at 6 (internal citations omitted).

We agree with the trial court's cogent analysis and conclude that the trial court did not err when it awarded Mr. Markle a $4,000.00 credit for work he completed on the marital residence after the date of separation. Appellant's claim on appeal fails.

Next, Appellant claims that the trial court erred when it accepted the valuation of the marital home that was tendered by Mr. Markle's expert (to the exclusion of her own expert's valuation of the marital home) and when the trial court "ignore[d the] stipulated damage to the marital home" in its valuation of the marital home. Appellant's Brief at 11-12. These claims fail because the trial court's alleged errors could only have benefitted Appellant.

To be sure, Mr. Markle's expert valuation of the marital home was $35,000.00 **higher** than Appellant's expert's valuation, and any further consideration of the "stipulated damage to the marital home" would only

- 22 -

have **lowered** the home's valuation. Here, however, the trial court awarded the home to **Mr. Markle**. Thus, the trial court's alleged error in valuing the marital home at higher amount could have only resulted in Appellant receiving a larger share of the remaining marital property. Appellant was, therefore, not aggrieved by the trial court's action in this instance and her claim on appeal necessarily fails. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 700 (Pa. Super. 2000) ("[a] party is 'aggrieved' when the party has been adversely affected by the decision from which the appeal is taken. A prevailing party is not 'aggrieved' and therefore, does not have standing to appeal an order that has been entered in his or her favor") (internal citations omitted); Pa.R.A.P. 501 ("[e]xcept where the right of appeal is enlarged by statute, any party who is aggrieved by an appealable order, or a fiduciary whose estate or trust is so aggrieved, may appeal therefrom").

For Appellant's third numbered claim on appeal, Appellant contends that the trial court "failed to consider" the taxable consequences of its equitable distribution award. Appellant argues that the trial court's equitable distribution award provided her with $20,000.00 in cash and $50,000.00 from Mr. Markle's 401(k) account. However, Appellant claims, the trial court "did not take into consideration the taxable consequences of early withdrawal of these monies from [Mr. Markle's] 401(k) that would be awarded to [Appellant] should she invade these funds for a down payment

for a new home." Appellant's Brief at 14. As the trial court has ably explained, Appellant's claim is meritless:

> After reviewing the evidence and testimony provided . . . [the trial c]ourt finds that [Appellant] provided no testimony or evidence that [she] would be restricted in her ability to purchase a home if [she were] not awarded the martial home, and regardless, the Master **did consider** the nature and extent of qualified assets awarded to [Appellant]. . . .
>
> In his Recommendation, the Master awarded [Appellant] $39,180.00 in unqualified assets that [Appellant] would be able to use in purchasing a new home. With regard to the Master recommending that [Appellant] be awarded $50,000.00 of [Mr. Markle's] 401(k) by virtue of a QDRO, the Master considered the nature and extent of that asset being qualified. [Indeed, the Master noted that] "[i]f [Appellant] chooses to retain [the $50,000.00] in a manner that will result in any income tax consequences, she shall be solely responsible to pay said income tax or reimburse [Mr. Markle] for the same." [Appellant's] exception with regard to the Master failing to take into consideration the nature and extent of qualified assets awarded to [Appellant] is denied.

Trial Court Opinion, 5/30/14, at 9-10 (internal citations omitted) (emphasis added).

We agree with the trial court's analysis. Therefore, Appellant's third numbered claim on appeal fails.

Next, Appellant claims that the trial court erred when it "recognize[d] only $14,000.00 of the total sum of [approximately $32,000.00] deposited in the joint bank account of [Appellant] and [Mr. Markle] as martial property." Appellant's Brief at 3 and 13. This claim fails.

At the Master's hearing, Mr. Markle testified that: the funds in the subject bank account constituted the proceeds from the "Mill Creek property" house "flip;" the Mill Creek property house flip was engineered by Mr. Markle and Mr. Markle's brother, Todd Markle; Mr. Markle and Todd Markle were partners in the Mill Creek property investment; Mr. Markle and Todd Markle agreed to split the proceeds from the Mill Creek property sale "50-50;" the net proceeds from the sale of the Mill Creek property were $112,737.91; Mr. Markle and Todd Markle each took $40,000.00 from the total proceeds, leaving $32,737.91 in the account; when the bank account was closed, it had a balance of $28,359.27; and, the $4,378.64 that was deducted from the account before it was closed was applied to interest payments on Appellant's and Mr. Markle's home equity line of credit on their marital home. *See* N.T. Master's Hearing, 9/26/13, at 127-130. The trial court considered this testimony and determined that one-half of the bank account's closing balance belonged to Todd Markle and that the remaining one-half of the bank account – which was approximately $14,180.00 – constituted marital property. Trial Court Opinion, 5/30/14, at 7-9.

On appeal, Appellant does not contest the substance of Mr. Markle's testimony. Rather, Appellant essentially claims that the trial court should not have believed Mr. Markle's testimony and that Mr. Markle's testimony was insufficient to rebut the "presumption that [the entire $32,737.91 was] martial property." Appellant's Brief at 13. According to Appellant, for Mr. Markle's testimony to be believed, Mr. Markle needed to bolster his

testimony with "a Partnership Agreement or partnership returns" between himself and his brother. *Id.* Appellant's claim is meritless.

It is true that, under 23 Pa.C.S.A. § 3501(b), there is a presumption that "[a]ll real or personal property acquired by either party during the marriage is . . . marital property." 23 Pa.C.S.A. § 3501(b). However, in the case at bar, the trial court believed Mr. Markle's testimony and arrived at the factual conclusion that one-half of the $28,359.27 in the bank account was **not** Mr. Markle's "personal property," but was rather the personal property of Todd Markle.[6] Therefore, the trial court determined that only $14,180.00 in the bank account constituted marital property. Trial Court Opinion, 5/30/14, at 9.

On appeal, Appellant claims only that the trial court should have disbelieved Mr. Markle's testimony and demanded that Mr. Markle produce a "Partnership Agreement or partnership returns." Appellant's Brief at 13. However, "[i]t is well settled that the trier of fact is free to believe all, part, or none of a witness' testimony." *Commonwealth v. Weir*, 738 A.2d 467, 471 (Pa. Super. 1999). Here, the trial court chose to believe Mr. Markle's testimony and the trial court thus concluded that only $14,180.00 in the

_____

[6] Again, the trial court determined that the $4,378.64 that was deducted from the original balance of $32,737.91 in the account was taken by Citizen's Bank "to make interest payments on [Mr. Markle's] and [Appellant's] home equity line of credit." Trial Court Opinion, 5/30/14, at 9. Neither party claims that the trial court erred with respect to this determination.

subject bank account constituted marital property. Such was its prerogative as fact-finder. Appellant's claim of error fails.

Finally, Appellant claims that the trial court erred when it only awarded her $4,500.00 in attorneys' fees, when Appellant requested that the trial court award her $21,000.00 in legal fees. According to Appellant, the trial court should have recognized that Mr. Markle's salary is more than twice her own salary and the trial court should have then "allocated responsibility [for her attorneys'] fees in proportion to the part[ies'] income." Appellant's Brief at 15. This claim fails.

As we have held:

> We will reverse a determination of counsel fees and costs only for an abuse of discretion. The purpose of an award of counsel fees is to promote fair administration of justice by enabling the dependent spouse to maintain or defend the divorce action without being placed at a financial disadvantage; the parties must be "on par" with one another.
>
> Counsel fees are awarded based on the facts of each case after a review of all the relevant factors. These factors include the payor's ability to pay, the requesting party's financial resources, the value of the services rendered, and the property received in equitable distribution.
>
> Moreover, counsel fees are awarded only upon a showing of need.

*Anzalone v. Anzalone*, 835 A.2d 773, 785-786 (Pa. Super. 2003) (internal citations and corrections omitted) (some internal quotations omitted); *see also Biese v. Biese*, 979 A.2d 892 (Pa. Super. 2009) (same).

The trial court did not abuse its discretion when it awarded Appellant $4,500.00 in attorneys' fees. As the trial court explained:

> [Appellant's] counsel presented a bill of $21,027.96. [Appellant] earns approximately $63,000.00 per year, receives $894.00 per month in child support, will receive [$34,180.00] in unqualified cash assets[,][fn.1] and will receive $73,053.28 in qualified assets[fn.2] in addition to other assets as a result of the recommended equitable distribution award. [Appellant's] attorney's fees and costs were ultimately lower than they would have been as a result of both parties' counsel being very prepared and stipulating as to which items were marital property. [Appellant] has failed to show that she "needs" to be awarded more than $4,500.00 in counsel fees or, that by failing to award [her] more than $4,500.00 in counsel fees, [she] is or was placed at a "financial disadvantage of maintaining or defending the divorce action." [Appellant] has failed to show that she was not "on par" with [Mr. Markle]. [The trial c]ourt finds that the Master's award of $4,500.00 in counsel fees was sufficient to place [Appellant] "on par" with [Mr. Markle] and that [Appellant] is not at a "financial disadvantage in maintaining or defending the divorce action."
>
> > [fn.1] That amount being the $14,180.00 from the one-half proceeds of the Mill Creek property sale plus the [$20,000.00] [Mr. Markle] shall pay to [Appellant].
> >
> > [fn.2] [This amount is comprised of Appellant's] $23,053.28 [403(b)] plan from her employer plus the $50,000.00 from [Mr. Markle's] 401(k) [plan] by virtue of a QDRO.

Trial Court Opinion, 5/30/14, at 10-11 (internal citations and some internal footnotes omitted).

We agree with the trial court and conclude that the court did not abuse its discretion when it awarded Appellant $4,500.00 in attorneys' fees. Appellant's final claim on appeal thus fails.

Order affirmed.    Mr. Markle's motion to quash appeal denied. Jurisdiction relinquished.

Bowes, J. joins the memorandum.

Strassburger, J. files a concurring dissenting memorandum.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/22/2015