**Jessie ANZALONE, Appellee,**

v.

**James ANZALONE, Appellant.**

Superior Court of Pennsylvania.

Submitted July 21, 2003.
Filed Oct. 28, 2003.

Kimberly D. Borland, Wilkes-Barre, for appellant.

Theodore R. Laputka, Jr., Hazelton, for appellee.

Before: KLEIN, BENDER and TAMILIA, JJ.

BENDER, J.

¶ 1 James Anzalone (Husband) appeals from the November 19, 2002 order that entered the final divorce decree ending his marriage to Jessie Anzalone (Wife). Husband raises numerous issues concerning the valuation and equitable distribution of the parties' marital estate, and the denial of attorney's fees. We affirm in part, vacate in part, and remand for recalculations in accordance with the directives contained within this opinion.

¶ 2 On February 20, 1996, Wife filed a complaint in divorce and the matter was presented to a Master, who after three days of hearings issued a report and recommendations regarding equitable distribution of the marital property, counsel fees and costs. Husband filed exceptions that were denied by the trial court by order, dated November 5, 2002. In the November 5th order, the court decreed the adoption of the Master's report and, subsequently, on November 19, 2002, issued the final divorce decree dissolving the parties' marriage.[1] This appeal followed.

¶ 3 Initially, we first set out the facts we have gleaned from the Master's report,[2] which contains a discussion of the evidence presented in the context of the eleven fac-

1. A trial court order is listed on the docket, showing the grant of Wife's petition for bifurcation, and ordering that the parties "are divorced from the bonds of matrimony," but retaining jurisdiction of the pending economic claims raised by the parties. *See* Order, 3/12/01. Husband appealed to this Court from the March 12th order. Although the trial court issued a subsequent order indicating that the prior order granting bifurcation was issued in error, Order, 8/21/01, this Court, in addressing Husband's argument, ordered a remand and determined that the trial court had discretion to allow additional evidence to determine the bifurcation issue. *Anzalone v. Anzalone*, 808 A.2d 239 (Pa.Super.2002) (unpublished memorandum).

2. The Master's report and recommendations are contained within an extensive 28–page document with attached exhibits.

tors provided in section 3502(a) of the Divorce Code, 23 Pa.C.S. § 3502(a).[3] The parties, neither of whom had been previously married, were married on November 13, 1971, and separated on February 14, 1996, after more than 24 years of marriage. They are the parents of four children, who have all reached the age of majority. Wife is in good health and has taught at a private school, presently earning $36,000.00 per year. Wife has a retirement plan with TIAA/CREF. Husband, who at the time of the Master's hearing was 56 years old, is an attorney who earlier in his career worked for a public defender's office and then established his own practice. In November 1994, Husband admitted himself into an inpatient alcohol rehabilitation program and as a result he experienced a decrease in clients in his law practice. In December 1995, Husband underwent cardiac bypass surgery, and subsequently, he closed his law practice. Husband's federal income tax return for the year 2000 indicated gross income of $9,239.00. Husband has had medical insurance coverage through Wife's

employment for which he pays $289.00 per month. Husband testified that although he has sought employment as an attorney, he has been unable to secure such employment. Neither party presented evidence of extraordinary expenses or needs. Nor did either party claim contribution to the educational training or increased earnings of the other party.

¶ 4 With regard to the fifth factor under section 3502(a), the Master concluded that both parties will have an opportunity to acquire future assets and income, relying on Husband's earning power as an attorney and on Wife's non-marital assets, inheritance and employment. The Master also found that both parties contributed to the household and child rearing responsibilities. However, the Master recognized that "the parties had difficulty paying their usual living expenses resulting in repeated requests to Wife's father for financial assistance." Master's report, 2/6/02, at 7. The Master also found that "the acquisition of most of the property subject to the claim for equitable distribution was obtained through gifts made by Wife's grand-

---

3. Section 3502(a) provides:

(a) **General rule.**—In an action for divorce or annulment, the court shall, upon request of either party, equitably divide, distribute, or assign, in kind or otherwise, the marital property between the parties without regard to marital misconduct in such proportions and in such manner as the court deems just after considering all relevant factors, including:

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

(4) The contribution by one party to the education, training or increased earning power of the other party.

(5) The opportunity of each party for future acquisitions of capital assets and income.

(6) The sources of income of both parties, including, but not limited to, medical retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

(8) The value of the property set apart to each party.

(9) The standard of living of the parties established during the marriage.

(10) The economic circumstances of each party, including Federal, State and local tax ramifications, at the time the division of property is to become effective.

(11) Whether the party will be serving as the custodian of any dependent minor children.

23 Pa.C.S. § 3502(a).

mother and parents to Wife and to the parties." *Id.* Moreover, concerning the contribution or dissipation in the acquisition of marital property, as per the seventh factor under section 3502(a), the Master found:

With respect to preserving marital assets during the marriage, the Master finds that Wife expended sixty-nine thousand two hundred thirty eight dollars ($69,238.00) of her non-marital money to pay marital debts. Wife pledged stock that she received as a gift from her family as collateral for two loans with PNC Bank. In order to satisfy its loan, PNC Bank in 1995 took Wife's non-marital stock which was valued at $46,238.75. Additionally, the Master finds that Wife transferred twenty-three thousand dollars ($23,000.00) from her non-marital PNC Savings Account as payment on the marital loans from Wife's father.

After the parties separated, Wife preserved the marital residence by making repairs and paying the real estate taxes, homeowner's insurance, lawn-care and snow removal. Wife paid approximately $3,561.00 in real estate taxes. Wife paid $5,439.00 to repair the bathroom. Wife purchased and installed seven windows. Wife paid approximately $1,000.00 per year for homeowner's insurance. Wife paid approximately $1,500.00 per year for lawn care.

Husband testified that he also paid real estate taxes and produced Exhibits D–11 and D–12. Said Exhibits are a July 16, 1996 cashier's check stub made payable to Luzerne County Treasurer in the amount of $1,724.40 and the Treasurer's receipt for said payment.

The Master concludes that Wife rather than Husband expended her non-marital money to preserve marital assets.

Master's report at 7–8 (citations to the record omitted).

¶ 5 Specifically, with regard to the marital property, the Master discussed the issues relating to the marital home, which was purchased on January 30, 1975, from Wife's family for $28,000.00. The house is situated on 1.3 acres and is described as a 1½ story caretaker's cottage with an addition. The main section of the house is in good condition, but the addition is in such a deplorable state that the parties and their experts concurred that the addition should be demolished. The Master set forth an extensive description of the property based on the parties' testimony. She also discussed in detail the testimony provided by the parties' experts, crediting Wife's expert's opinion that the property's fair market value as of May 15, 2001, was $90,000.00. Husband's expert opined that the fair market value was $200,000.00 as of June 8, 1999. Although the Master recognized that both experts were experienced appraisers, she based her credibility determination on the fact that Wife's expert had extensive experience with sales of homes in the community where the house was located as opposed to Husband's expert who had never before appraised a home in Luzerne County. The Master recommended that the real estate be awarded to Wife. She also denied Husband's request for rental credit for the time Wife occupied the marital residence following separation "in light of the fact that [Wife] maintained the real estate, paid real estate taxes, homeowner's insurance, lawn care and snow removal and that she used her non-marital money to pay marital debts." *Id.* at 14.

¶ 6 The Master next discussed the increase in value of stock titled in the name of Wife, a portion of which is stock in W.H. Conyngham & Co., Inc. (Conyngham Company), a family-owned company. Based on

Wife's father's testimony, the Master found that the stock was gifted to Wife by her father and her grandmother and, thus, the base value of the stock was non-marital property. The Master relied on testimony from Wife's expert rather than Husband's expert to determine the increase in value of the stocks that represented the marital portion. She found Wife's expert, who worked for Management Planning, Inc., the entity that had performed economic and financial analysis for the Conyngham Company since 1963, to be credible because he utilized "financial statements, considered the performance of the company since the last analysis, and interviewed management to learn what has happened behind the numbers and to obtain other key data and information that are not contained in the financial statements." *Id.* at 16. To further explain her decision not to credit Husband's expert, the Master cited testimony wherein Husband's expert acknowledged that he had not viewed the Conyngham Company's financial statements, the real estate or stores, and had not met with anyone from the company or Management Planning.

¶ 7 Specifically, Wife's expert provided a per-share value for the voting stock at $45.22, and a value for the non-voting shares at $42.96, as of December 31, 1994. Wife's expert also provided values as of December 31, 1997, *i.e.*, $57.65 per voting share and $54.77 per non-voting share. Husband's expert also provided valuation as of December 31, 1997, of $107.39 per voting share and $102.02 per non-voting share. As part of the findings in regard to these assets, the Master concluded that, although the parties separated in February of 1996, neither expert gave values as of that date. Therefore, the Master concluded that economic justice would be achieved by *using* Wife's expert's values as *of the* December 31, 1997 date minus the gift basis arriving at a value of $76,835.50

for the Conyngham Company stock subject to the equitable distribution claim.

¶ 8 As for other stock titled in Wife's name, the Master calculated the marital portion as of January 28, 2002. She used the value as of that date minus the gift basis arriving at the sum of $37,863.93 as the increase in value subject to the equitable distribution claim. The Master then totaled the value of the stock for distribution purposes ($76,835.00 + $37,863.93 = $114,699.43) and subtracted the marital liability owed to Wife's father ($114,699.43–$79,474.51 = $35,224.92). Dividing that sum in half, the Master determined that $17,612.46 was the gross amount due Husband from the increase in value of Wife's non-marital stock. Further, subtracting 20% for capital gains taxes, the Master awarded to Husband the sum of $14,090.00, representing his share of the increase in value of Wife's non-marital stock.

¶ 9 Additionally, the Master determined that an insurance check in the amount of $5,153.62 related to the theft of Husband's automobile was marital property. Husband was not given credit on his claim that he used the funds to pay real estate taxes in 1999 due to his inability to provide proof that he paid those taxes; nevertheless, the Master awarded that full amount, $5,153.62, to Husband. As for the parties' personal property, it was awarded pursuant to a schedule attached to the Master's report, which was stipulated to by the parties, and valued at $9,920.00 to Husband and $6,673.00 to Wife.

¶ 10 The Master also discussed whole life insurance policies purchased by Wife's father, who paid the premiums on the policies. The first policy insured the life of Wife for $100,000.00 with Wife as the owner of the policy, and the second insured the life of Husband for $50,000.00 with Wife

named as the owner. The Master found that the cash surrender value of the first policy was $1,733.00 and the cash surrender value of the second policy was $870.00, both valued as of March 5, 1996. The Master found the policies were gifts to Wife and, therefore, Husband was entitled to his portion of the increase in value of the policies for a total amount of $1301.50 ($435.00 + $866.50 = $1301.50). Thus, the Master directed Wife to pay $1301.50 to Husband, which she concluded represented Husband's share of the increase in value of the life insurance policies.

¶ 11 The Master next awarded Husband 50% of Wife's TIAA/CREF pension acquired from the date of marriage, November 13, 1971, to date of separation, February 14, 1996, plus or minus half of any gains or losses of the marital portion from the date of separation to the day of distribution.[4]

¶ 12 The Master next addressed Husband's claim on Wife's future interest in a testamentary trust. Wife's grandmother's will provided that Wife would receive an interest in a trust provided Wife was living on the date of her father's death. Relying on *McGinley v. McGinley*, 388 Pa.Super. 500, 565 A.2d 1220 (1989), and *Powell v. Powell*, 395 Pa.Super. 345, 577 A.2d 576 (1990), the Master concluded that Wife's interest in the trust was vested subject to divestment and, therefore, did not fall within the legislative definition of marital property and was not subject to equitable distribution.

¶ 13 Finally, the Master extensively discussed the parties' marital debt, discussing the testimony provided by Wife's father, Wife and Husband. The Master found that the testimony was consistent to the extent that Husband would ask Wife's father for money and then Wife's father

would transfer the money to Husband and/or Wife. However, while Husband contended that the funds were gifts, Wife and her father asserted that they were loans which Wife's father offset against annual gifts. Based in part on Wife's father's records, which showed the amounts of the loans and the credit given by way of gifts to reduce the amount of the loan, the Master accepted that the parties owed Wife's father the sum of $79,474.51 as marital debt. Additionally, the Master found that Wife had expended approximately $69,000 of her non-marital money to pay marital debt, namely $46,238.75 to PNC Bank and $23,000.00 to Wife's father. Thus, with reliance on *Litmans v. Litmans*, 449 Pa.Super. 209, 673 A.2d 382 (1996), the Master concluded that since these payments by Wife were made prior to separation, they were a marital debt, and that Wife's expenditure from her non-marital assets should be treated as a loan to the marital estate from Wife.

¶ 14 The Master calculated the marital assets as totaling $214,079.05. She subtracted marital debt owed to Wife's father and to Wife, thereby leaving $65,604.54, which she divided in half, indicating that Wife should pay to Husband the sum of $32,802.27. Additionally, Husband was entitled to 50% of the marital portion and any post-separation appreciation of Wife's pension.

¶ 15 Finally, the Master concluded that in light of her "recommended award of marital property to Husband and Husband's professional training and work experience," Master's report at 27, Husband was not entitled to attorney's fees and costs.

¶ 16 As noted above, the trial court denied Husband's exceptions, adopted the Master's report and recommendations in

---

4. Wife's attorney was instructed to prepare

the QDRO to effectuate this distribution.

its entirety and issued the final decree in divorce. Husband filed a timely appeal and raises the following issues for our review:

A. Did the trial court improperly value the marital estate?

   1. Did the lower court err in its valuation of the fund created by the gifts made by William L. Conyngham [Wife's father] to the parties during the course of their marriage?

   2. Did the lower court place an improper marital valuation of [W]ife's interest in the [C]rummy [T]rust?

   3. Did the lower court improperly value the marital [sic] residence?

   4. Did the lower court improperly value the marital appreciation of stock of W.H. Conyngham Co., Inc., acquired by [Wife] by inheritance during the marriage?

   5. Did the lower court place an improper marital valuation upon the testamentary trust of [Wife]?

   6. Did the lower court improperly value the cash value of the life insurance [sic] policy of the parties?

B. Did the lower court make an improper proportion of distribution of the marital property to Husband?

C. Did the lower court err in failing to award Husband counsel fees in the amount of $20,000?

Husband's brief at 3.

■ ¶ 17 Initially, we note that we address equitable distribution claims in accordance with the following principles:

[Our standard] of review in equitable distribution matters is limited. It is well established that absent an abuse of discretion on the part of the trial court, we will not reverse an award of equitable distribution. [In addition,] [w]hen reviewing the record of the proceedings, we are guided by the fact that trial courts have broad equitable powers to effectuate [economic] justice and we will find an abuse of discretion only if the trial court misapplied the laws or failed to follow proper legal procedures. [Further,] [t]he finder of fact is free to believe all, part, or none of the evidence and the Superior Court will not disturb the credibility determinations of the court below.

*Viles v. Viles,* 416 Pa.Super. 95, 610 A.2d 988, 990 (1992) (citations omitted) (alteration in original) (quoting *Murphy v. Murphy,* 410 Pa.Super. 146, 599 A.2d 647, 653 (1991)).

¶ 18 Husband first argues that "the lower court should have found that the marital estate includes an amount equal to $672,775.00 representing unaccounted for monies and securities held in trust for [Wife] and [Husband] by William L. Conyngham." Husband's brief at 16. Husband also contends that "there are no marital debts owing from [Wife] and [Husband] to William L. Conyngham." *Id.* To support these assertions, Husband claims that for the years 1979 through 1994, Mr. Conyngham reported to the Internal Revenue Service that he and his wife gave joint gifts of securities, cash and life insurance to Husband and Wife, approximating $20,000.00 per year and totaling $873,540.00. Husband also asserts that between 1990 and 1994 "Mr. Conyngham gave to the Anzalones $33,265.00 in the form of insurance premiums funding a Crummy Trust, which is funded with a $1,000,000.00 life insurance policy in which [Wife] has a ⅙ interest." Husband's brief at 12. Husband further contends that the "enhancement" of the insurance premiums, amounting to $39,764.00, was removed from the total value of the gifts and

that Wife's interest in the Crummy Trust is a marital asset worth $200,000.00.

¶ 19 The basis for Husband's contentions all center on his representation that everything advanced to Husband and Wife through the years of their marriage were gifts and not loans and that all the gifts were made to the parties jointly and not to Wife alone. However, in referring to Mr. Conyngham's gift tax returns as proof of his gifts to the parties jointly, Husband overlooks Mr. Conyngham's explanation that Husband's name was included "because he owed me a lot of money, and I was crediting those loans." Deposition of Mr. Conyngham, 1/3/01, at 11. Moreover, Husband impermissibly relies on an attachment to his brief that is not included in the certified record. *Possessky v. Diem,* 440 Pa.Super. 387, 655 A.2d 1004, 1007 n. 1 (1995) (stating that this Court "may only consider material duly certified in the record transmitted to us by the trial court"). Husband also acknowledges that he is attacking Mr. Conyngham's credibility, but argues that if these gifts were in actuality loans, as Mr. Conyngham contended, then there should have been promissory notes to memorialize them as had occurred when the parties executed such a document to borrow the funds to purchase their home in 1975, and which they satisfied. Husband also attempts to counter Mr. Conyngham's testimony that he provided Husband with large checks over the years by asserting that no checks were submitted into evidence that would establish these advances to Husband.

¶ 20 Our thorough review of the extensive record belies Husband's assertions. Wife's Exhibit P–7 contains almost an inch thick stack of copies of checks made out to either Husband or Wife, covering the years 1983 through 1996. Moreover, our review reveals that documentation and testimony provided by the parties, and be-

lieved by the Master, supports the Master's findings that Mr. Conyngham loaned certain funds to Husband and Wife over the years. Clearly, Husband does not dispute that he received monies from Mr. Conyngham, but he has not provided citation to the record that supports his contention that a "fund" was created for the parties' benefit. Rather, the Master concluded that evidence shows the existence of debt, which she considered along with the increase in the value of Wife's non-marital property to formulate the distribution of the marital estate. We do not find that the Master erred in this regard and, therefore, Husband's first claim must fail.

¶ 21 Husband next argues in three sentences that the annual life insurance premiums paid by Mr. Conyngham to fund the Crummy Trust are gifts to both Husband and Wife and that Wife's ⅕ interest in the $1,000,000.00 trust is, therefore, marital property. Since Husband has not developed this argument or cited any authority to support his contention, we decline to consider the merits of this claim. *See Fielding v. Fielding,* 454 Pa.Super. 261, 685 A.2d 178 (1996). However, we note that Mr. Conyngham testified that the premiums to fund the trust are in essence gifts of $6,000.00 to each of his five children, one of which is Wife. As recognized by the Master, these sums are not marital property in that they are a vested interest subject to complete divestment, because in order to realize these sums Wife's father must predecease Wife. Moreover, pursuant to the *McGinley* and *Powell* opinions, the monies are not subject to equitable distribution.

¶ 22 Husband next contends that the Master should have accepted his real estate expert's appraisal of the marital home instead of Wife's expert's appraisal. This argument is essentially an attack on the credibility determinations formulated

by the Master. Again, Husband provides no citation to authority that would allow this Court to disturb the Master's determination. *See Fielding, supra.* Neither will we usurp the trial court's duty as finder of fact, *Miller v. Miller,* 744 A.2d 778 (Pa.Super.1999), nor will we disturb the fact finder's credibility determinations. *See Fielding, supra.* Our review reveals that the evidence with regard to the valuation of the marital residence supports the findings made by the Master. The Master was provided with all the information that Husband now asserts in his brief and she chose to accept the opinion provided by Wife's expert. This was not error.

¶ 23 Husband next takes issue with the Master's valuation of Wife's interest in the Conyngham Company. He again argues that his expert's opinion is the one that the Master should have accepted. Specifically, he attacks Wife's expert's credentials and his valuations, contending that his expert's opinion is more compelling and appropriate. He argues that because Wife's expert is affiliated with Management Planning, Inc., the entity that provides services to the Conyngham Company, this in some way taints the expert's opinion. However, Husband solely relies on statements made by his expert in formulating his opinion as to how to value Wife's interest. These statements were not accepted by the Master. *See Brody v. Brody,* 758 A.2d 1274, 1279 (Pa.Super.2000) (stating that no error existed where "[t]he master saw the evidence, heard the expert testimony, and made factual findings based on that testimony, and the trial court adopted [the] reasoning"). Therefore, again we conclude that this argument attacks the Master's credibility determination, which we refuse to disturb since our review confirms that evidence in the record supports the Master's findings.

¶ 24 However, in conjunction with this issue, Husband argues that the Master erred in reducing, by the 20% capital gains tax, the value of Wife's non-marital stock awarded to Husband. We agree. We recognize that the trial court must consider "[t]he economic circumstances of each party, including Federal, State and local tax ramifications, at the time the division of property is to become effective." 23 Pa.C.S. § 3502(a)(10). Nevertheless, in *Hovis v. Hovis,* 518 Pa. 137, 541 A.2d 1378 (1988), the Supreme Court discussed potential tax liability in conjunction with equitable distribution as follows:

> If a taxable event such as a sale or other transfer of property is required by the award of equitable distribution, or is certain to occur shortly thereafter, the tax liability of the parties can be reasonably ascertainable. However, where there is merely a likelihood or possibility that a taxable event will occur, the court is left to speculate as to the tax consequences.
>
> . . . .
>
> In order to insure a "fair and just determination and settlement of property rights" we favor predictability over mere surmise in the valuation and distribution of marital property after divorce. Accordingly, we hold that potential tax liability may be considered in valuing marital assets only where a taxable event has occurred as a result of the divorce or equitable distribution of property or is certain to occur within a time frame such that the tax liability can be reasonably predicted.

*Id.* at 1380–81 (footnote omitted). *See also Smith v. Smith,* 439 Pa.Super. 283, 653 A.2d 1259 (1995).

¶ 25 Nothing in the record cited by either party or the Master indicates that a sale or other transfer would create a tax liability that could reasonably be ascer-

tained. Therefore, we conclude that the Master incorrectly subtracted 20% from the gross value of Wife's non-marital stock awarded to Husband. Accordingly, on remand this figure must be adjusted and the sum of $3,522.50 must be added back so that Wife's cash payment to Husband with regard to the increase in her non-marital stock is $17,612.46.

¶ 26 Husband next asserts that the expectancy due Wife from the trust established by her grandmother is marital property and that distribution of the marital portion "can be accomplished by making it contingent upon its receipt in the future by [Wife]." Husband's brief at 22. Although Husband recognizes that Wife receives nothing unless her father predeceases her, he again falls to cite any authority to support his position. Moreover, he fails to distinguish the *McGinley* and *Powell* opinions, which clearly dictate that, because Wife did not possess her interest in the trust at the time the parties separated, the increase in value is not marital. In these cases, this Court found that the increase in value of this future interest did not comport with the statutory definition of marital property [5] and, therefore, was not subject to a claim for equitable distribution. *See also Brody, supra* (stating that the determination of whether an asset is part of the marital estate is a matter within the sound discretion of the fact finder). Thus, we conclude this issue has no merit.

¶ 27 Husband's next issue concerns the marital values of the insurance policies insuring the life of Husband and of Wife that were gifted to Wife, making her the owner of the policies, by her father through his payment of the annual premium. Husband contends that the Master mistakenly used the figure that represent-

ed the growth in cash value for a single year, which he asserts has nothing to do with the actual cash surrender value of the policies. In response, Wife argues that if the figures asserted by Husband are relied upon to calculate the marital value of the policies, those values must be reduced by the non-marital gift from Wife's father and would result in a negative amount.

¶ 28 By way of example, for the year 1996, Wife's Exhibit P–13 shows that the increase in cash value from March of 1995 to March of 1996 equals $870.00, and the total accumulated cash value of the $50,000.00 policy on Husband's life as of March of 1996 is $15,285.00. It is apparent that the Master utilized the $870.00 figure, while Husband asserts that the $15,285.00 amount is the proper amount representing the total accumulated cash value from the inception of the policy.

¶ 29 It is obvious to this Court that neither party takes issue with the sums listed on Wife's Exhibit P–13 or Exhibit P–14, which is a similar exhibit that provides amounts accumulated on the $100,000.00 policy on Wife's life. We also note that the parties cite very minimal testimony regarding these exhibits, mainly, testimony given by Wife's father. N.T. Master's hearing, 5/16/01, at 179–84. Our review of that testimony sheds little to no light on the issue raised here, except to the extent that Wife's father believed that the values of the policies as of the date of the hearing in 2001 were $35,044.00 and $19,709.00. These amounts are more in line with Husband's argument as to the accumulated cash value of the policies in 1996. We, therefore, conclude that evidence in the record does not support the Master's findings as to the accumulated

---

**5.** *See* 35 Pa.C.S. § 3501(a); *see also Wellner v. Wellner,* 699 A.2d 1278, 1281 (Pa.Super.1997).

cash value of the life insurance policies. However, Husband's suggested value relying on Wife's exhibits fails to include the premiums paid by Wife's father, which are gifts to Wife.

¶ 30 Clearly, gifts are not marital property, but the increase in their value during the marriage is marital property subject to equitable distribution. *Smith,* 653 A.2d at 1265. Moreover, a master or trial court "must exercise discretion and rely on the estimates, inventories, records of purchase prices, and appraisals submitted by both parties." *Id.* at 1265–66. Furthermore, "[w]here the evidence offered by one party is uncontradicted, the court may adopt this value although the resulting valuation would have been different if more accurate and complete evidence had been presented." *Litmans,* 673 A.2d at 387.

¶ 31 Utilizing the two exhibits submitted by Wife and not contradicted by Husband, we conclude that the trial court must recalculate the marital value of the two policies and the amount due Husband. Exhibit P–13 shows that the 1996 cash value of the $50,000.00 policy is $15,285.00. However, that sum must be reduced by the amount that Wife's father paid for the policy over the years. Exhibit P–13 also shows that although the yearly premium equaled $1,136.50, that sum was reduced by a dividend leaving a lesser amount due to be paid by Wife's father, *i.e.,* the gift portion. *See* Exhibit P–13, Column 3 entitled "Paid." Adding the premiums actually paid from 1978 through 1996 results in a gift to Wife of $14,822.65, which must then be subtracted from the accumulated value *i.e.,* $15,285.00–$14,822.65 = $462.35. Thus, in accordance with the information on Exhibit P–13, representing the $50,000.00 policy, the martial value equals $462.35, which is less than the amount determined by the Master, but not the negative value asserted by Wife.

¶ 32 The same calculation with regard to the $100,000 policy (Exhibit P–14) provides the following:

| | | |
|---|---|---|
| | $26,181.00 | Cash value |
| (minus) | $22,487.50 | Amount paid by Wife's father (Column 3) |
| | $ 3,693.50 | Marital Value available for distribution |

Thus, rather than the amount of $1,301.50 due Husband from Wife as his portion of the value of the life insurance policies awarded by the Master, we believe that, based on Wife's exhibits, Husband is entitled to the sum of $2,077.93, *i.e.,* $462.35 + $3,693.50 = $4,155.85 ÷ 2 = $2077.93. Accordingly, we remand so that the final distribution in connection with the marital portion of the value of the insurance policies can be revised.

¶ 33 Husband next argues that "[c]onsiderations of the factors contained in 23 PS § 3502(a) compels a distribution of a greater portion of the marital estate to [Husband]." Husband's brief at 23. He contends that compared to Wife, his health is poor, that Wife's salary is four times greater than his, that Wife has a retirement plan and he does not, that he has a $100.00 per month bill for medication, and that after the divorce is final he will not be covered by Wife's health insurance through her employment. Husband also asserts that the record contains no evidence that he will have a greater earning capacity. Husband also takes issue with the Master's finding that both parties will have an opportunity to acquire future as-

sets and income. He also argues that the Master did not comment on his responsibilities "for cooking, grocery shopping, and transportation of the children." *Id.* at 25. He further argues that in her division of the marital property, the Master neglected to consider Wife's non-marital property as being on "[Wife's] side of the ledger." *Id.* at 26.

¶ 34 Based on the above, Husband cites various cases wherein this Court upheld unequal distributions of the marital assets, especially in circumstances, which Husband here believes are similar to his situation, where the wife has greater, more promising prospects than the husband. Husband contends that he believes that "[f]actors outside the statutory scheme, such as gender or [Husband's] resort to a rehabilitation program for alcoholism, cannot be used to negatively effect his distribution, by implication or reference." *Id.* at 27.

¶ 35 As we noted earlier, "[o]ur role in reviewing awards of equitable distribution is well settled." *Isralsky v. Isralsky,* 824 A.2d 1178, 1184 (Pa.Super.2003).

> The trial court has broad discretion in fashioning equitable distribution awards and we will overturn an award only for an abuse of that discretion. The Divorce Code states that the trial court Shall ... equitably divide, distribute or assign, in kind or otherwise, the marital property between the parties in such proportions and in such manner as the court deems just after considering all relevant factors ....

23 Pa.C.S. § 3502(a). In assessing the propriety of an equitable distribution scheme, our standard of review is whether the trial court, by misapplication of the law or failure to follow proper legal procedure, abused its discretion. Specifically, we measure the circum-

stances of the case, and the conclusions drawn by the trial court therefrom, against the provisions of 23 P.S. § 402(d) [now 23 Pa.C.S. § 3502(a)] and the avowed objectives of the Divorce Code, that is, to effectuate economic justice between the parties ... and insure a fair and just determination of their property rights.

*Id.* at 1184–85 (quoting *Middleton v. Middleton,* 812 A.2d 1241, 1247 (Pa.Super.2002) (citations and quotation marks omitted)). Moreover, the trial court has "the authority to divide the award as the equities presented in the particular case may require." *Drake v. Drake,* 555 Pa. 481, 725 A.2d 717, 727 (1999).

¶ 36 Husband's allegations are without merit. The Master specifically discussed each and every factor to the extent that they were applicable to the facts here. She was aware of and commented on all of the contributions each party made, and the extent of their assets and future opportunities. Other than the two errors with regard to the capital gains tax and the value of the marital portion of the insurance policies, both of which must be corrected on remand, we conclude that the Master did not abuse her discretion in her division of the marital assets. She effectuated economic justice, finding that the factors did not favor one party over the other and, thus, recommended an equal division of the marital property. Accordingly, we find this issue without merit.

¶ 37 Lastly, we address Husband's issue concerning the denial of his request for counsel fees and costs in the amount of $20,000.00.

We will reverse a determination of counsel fees and costs only for an abuse of discretion. The purpose of an award of counsel fees is to promote fair administration of justice by enabling the depen-

dent spouse to maintain or defend the divorce action without being placed at a financial disadvantage; the parties must be "on par" with one another.

. . . .

Counsel fees are awarded based on the facts of each case after a review of all the relevant factors. These factors include the payor's ability to pay, the requesting party's financial resources, the value of the services rendered, and the property received in equitable distribution.

*Perlberger v. Perlberger*, 426 Pa.Super. 245, 626 A.2d 1186, 1206–07 (1993). Moreover, "[c]ounsel fees are awarded only upon a showing of need." *Harasym v. Harasym*, 418 Pa.Super. 486, 614 A.2d 742, 747 (1992).

¶ 38 Husband contends that based on his own testimony the "fees are reasonable and were necessary in view of the nature of the contest." Husband's brief at 28. He also contends that he "was at a severe financial disadvantage in this action vigorously contested by his wife with the support of her family." *Id.* Wife responds that Husband provided no testimony showing need on his part and failed to even produce a bill itemizing the services he received.

■■■■ ¶ 39 As noted previously, the Master concluded that, based on the award of marital property coupled with Husband's training and experience, an award of counsel fees and costs was not warranted. Other than claiming his entitlement, Husband has not shown a need. Furthermore, we are unable to locate documentation in the record showing the amount of counsel fees incurred and the services performed for those fees. "Such documentation is required because a factor to consider in an award of counsel fees is the 'value of the services rendered.'" *Litmans*, 673 A.2d at 391. Therefore, we conclude that

the Master did not abuse her discretion in denying an award of counsel fees to Husband.

¶ 40 In conclusion, we vacate that part the decision below concerning the deduction of the capital gains tax and the calculation of the amount due Husband from the appreciation of the insurance policies. We remand for recalculation as to these two errors and a redistribution of the marital property if necessary. In all other respects, we affirm the trial court's order.

¶ 41 Affirmed in part, vacated in part. Remanded for recalculations consistent with this opinion. Jurisdiction relinquished.