J-A09016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARY CATHERINE KNAUS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DEEDRA KAY KNAUS | : | No. 456 WDA 2020 |

Appeal from the Order Entered March 13, 2020
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-16-009322-005

| | | |
|---|---|---|
| MARY CATHERINE KNAUS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DEEDRA KAY KNAUS | : | |
| | : | |
| Appellant | : | No. 497 WDA 2020 |

Appeal from the Order Entered March 13, 2020
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD 16-009322--005

BEFORE:   STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: JULY 9, 2021**

In this consolidated matter, Mary Catherine Knaus appeals a series of

issues pertaining the equitable distribution of the marital estate she shared

_____

[*] Retired Senior Judge assigned to the Superior Court.

with Deedra Kay Knaus.[1]  Specifically, Mary appeals the trial court's interpretation of the parties' Antenuptial Agreement; Mary also appeals certain aspects of her alimony award; and finally, Mary appeals the court's denial of her request for attorney's fees.  Deedra Kay Knaus cross-appeals.  Specially, she appeals from the trial court's denial of her petition to terminate the interim support (functionally, alimony *pendente lite*) owed to Mary.  After careful review, we affirm the trial court's order as to Mary's appeal, and we quash Deedra's cross-appeal as interlocutory.

The relevant factual and procedural history is as follows.  The parties married in July 1987.  Prior to their marriage, the parties entered into the Antenuptial Agreement, which outlined their property rights in the event of a divorce.  The parties separated in September 2016, and Mary filed a divorce complaint in December 2016, claiming equitable distribution, alimony *pendente lite*, spousal support, alimony, and counsel fees and costs.

In January 2017, Deedra petitioned for enforcement of the Antenuptial Agreement.  The trial court held a hearing in August 2017 and deemed the Antenuptial Agreement to be valid and enforceable.  Subsequently, on September 22, 2017, the trial court presided over the definition of marital property, per the terms of the Antenuptial Agreement.  Specifically, the court found that the income earned during the marriage was the separate and non-marital property of the party who earned it.  Thereafter, Mary sought leave to

_____

[1] Deedra is a transgender woman.  When the parties married, Deedra was adhering to her sex and gender assigned at birth, and she went by David.

appeal the court's interpretation of the Antenuptial Agreement. On October 4, 2017, the court denied Mary's request.[2]

In February 2019, the trial court accepted the parties' proposal to bifurcate the divorce from the equitable distribution of their marital estate; the court entered the Bifurcation Order on February 4, 2019, and the court entered the divorce decree on February 25, 2019.  Per the terms of the Bifurcation Order, Deedra "shall continue to maintain the *status quo* of support of [Mary], **pending resolution of the economic claims**…."  **See** Bifurcation Order, 2/4/19, at ¶ 2 (emphasis added).

The trial court set equitable distribution before the master, who issued a report and recommendation on November 1, 2019.  Mary then sought to continue Deedra's support obligation, while Deedra petitioned to terminate it.  While Deedra's petition was pending, Mary filed exceptions to the master's report and recommendation.  By its order of November 13, 2019, the court denied Deedra's petition, later clarifying its denial was without prejudice, and that Deedra could re-file her termination petition after the court adjudicated Mary's exceptions.

After presiding over argument, the court dismissed Mary's exceptions, and adopted the master's recommendation, by order of court dated March 9, 2020.  Both parties appealed.  We address Mary's appeal first.

_____

[2] At this juncture in the litigation, the trial court judge presiding over the parties' litigation left the Family Division of the Allegheny County Court of Common Pleas for the Criminal Division, and a new trial judge was assigned.

**456 WDA 2020**

Mary raises four issues in her appeal:

1. Whether the trial court erred as a matter of law and/or abused its discretion in its September 22, 2017 order of court in which it ruled that income earned during the marriage is separate and non-marital?

2. Whether the trial court erred as a matter of law and/or abused its discretion in the monthly amount of alimony awarded to [Mary]?

3. Whether the trial court erred as a matter of law and/or abused its discretion in failing to require security for the award of alimony?

4. Whether the trial court erred as a matter of law and/or abused its discretion in failing to award [Mary] counsel fees, expert fees, and expenses related to her alimony claim and increase in value of [Deedra's] company?

Mary's Brief at 7 (capitalization adjusted).

We begin with Mary's first appellate issue, which concerns the interpretation of certain language within the Antenuptial Agreement. We begin with our analysis by recognizing the nature of such agreements and identifying the appropriate standard of review:

> The determination of marital property rights through prenuptial, post-nuptial and settlement agreements has long been permitted, and even encouraged. Where a prenuptial agreement between the parties purports to settle, fully discharge, and satisfy any and all interests, rights, or claims each party might have to the property or estate of the other, a court's order upholding the agreement in divorce proceedings is subject to an abuse of discretion or error of law standard of review. An abuse of discretion is not lightly found, as it requires clear and convincing evidence that the trial court misapplied the law or failed to

follow proper legal procedures. We will not usurp the trial court's fact-finding function.

***Sabad v. Fessenden***, 825 A.2d 682, 686 (Pa. Super. 2003) (internal quotations and citations omitted); ***see also Lewis v. Lewis***, 234 A.3d 706, 711 (Pa. Super. 2020) ("In determining whether the trial court properly applied contract principles, the reviewing Court must decide, based on all the evidence, whether the trial court committed an error of law or abuse of discretion.") (citation omitted). Moreover, we also acknowledge that Mary alleges the court committed an error of law. To this end, we are mindful of the following. "To the extent we must decide a question of law…our standard of review is *de novo*, and our scope of review is plenary." ***Lewis*** 234 A.3d at 711 (citation omitted).

Regarding the interpretation of marital contracts, we have said:

> As to interpretation, enforcement, and remedies, in Pennsylvania, antenuptial agreements are interpreted in accordance with traditional principles of contract law. Generally, the parties are bound by their agreements, absent fraud, misrepresentation or duress. They are bound without regard to whether the terms were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains.
>
> When interpreting an antenuptial agreement, the court must determine the intention of the parties. When the words of a contract are clear and unambiguous, the intent of the parties is to be discovered from the express language of the agreement. Where ambiguity exists, however, the courts are free to construe the terms against the drafter and to consider extrinsic evidence in so doing.

***Sabad***, 825 A.2d at 688 (internal quotations and citations omitted).

Here, the trial court determined the words of the parties' Antenuptial Agreement were clear and unambiguous, and that they intended for their respective income to be separate and non-martial property in the event of a divorce. All agree the resolution of Mary's first issue depends upon the interpretation of three specific provisions of the Antenuptial Agreement. *See* Antenuptial Agreement, 7/8/87, at ¶¶ 1-2, 5.

- Paragraph 1 provides, in relevant part:

  It is stipulated between the parties that any property set forth on Schedule "A" [Deedra's assets] and any property set forth on Schedule "B" [Mary's assets] was acquired prior to the marriage of the parties and cannot be considered "marital property" in the event of a divorce of the parties as defined [by the Pennsylvania Divorce Code] in that (a) it was acquired prior to the marriage of the parties, and (b) it and other property have been excluded by agreement of the parties from being "marital property" as set forth in Paragraph 2 of this Agreement.

- Paragraph 2 provides, in relevant part:

  In the event of a divorce between the parties, each of them shall separately retain all rights in his [Deedra's] or her [Mary's] own separate property, whether now owned *or hereafter acquired*, other than property they own together….

- Paragraph 5 provides, in relevant part:

  Each of the parties shall have the absolute right to manage, dispose of, or otherwise deal with any property now separately owned or *hereafter separately acquired*, in any manner whatsoever, with the same effect as if no marriage had been consummated between the parties.

*Id.* (emphasis added)

The trial court determined Paragraphs 2 and 5 were governed by the question of whether income is marital or non-marital property: "The [c]ourt finds that Paragraph Two (2) provides the definition of what is ***separate*** property. It is the reading of this provision, along with Paragraph Five (5), that is dispositive in finding that income earned by either party during the marriage is separate and not marital property." ***See*** Order of Court, 9/22/17 (emphasis original).

The essence of Mary's argument is this. Because Deedra's Schedule A does not list "income" as separate property, the income must be considered marital property. ***See*** Mary's Brief at 26. She explains:

> Paragraph 1 of the Agreement contains the only definition of separate property in the entire Agreement and only that paragraph can control what is to be excluded from marital property. As it was the intention of the parties to define separate property set forth in Paragraph 1, and that definition is clear and unambiguous, that definition must control.

***Id.***

Mary reasons that nowhere within Paragraph 2 or Paragraph 5 is separate property defined differently than in Paragraph 1. To support her position, Mary observes the lack of a Rule 1925(a) opinion and provides reasons why the court must have ruled how it did.[3]

_____

[3] In her Brief, Mary notes that the previous trial judge, who interpreted the Antenuptial Agreement in 2017, could not issue a Rule 1925(a) opinion articulating its rationale. Mary states she is at a disadvantage as a result. ***See*** Mary's Brief at 25, n.3. We understand Mary's position, but the court's rationale is apparent from its order. The court clearly found the above

*(Footnote Continued Next Page)*

For instance, Mary surmises that the trial court erroneously re-wrote the Antenuptial Agreement to imply the missing term, "income," pursuant to the doctrine of necessary implication. ***See id.*** at 32. Under this common law doctrine, courts may imply a missing term where it both prevents an injustice, and "it is abundantly clear that the parties intended to be bound by such term." ***See, e.g., Kaplan v. Cablevision of PA, Inc.***, 671 A.2d 716, 720 (Pa. Super. 1996) (*en banc*) (citation omitted). Mary argues that the doctrine is inapplicable here, because implying the term "income" into the Agreement would severely prejudice her. ***See*** Mary's Brief at 32. We disagree with Mary's assertion that the court even applied the doctrine of necessary implication; the court never imposed onto a party some obligation or duty that the court determined was implicit in the penumbra of the parties' Agreement.

Mary also cites the transcript of the hearing, wherein the trial court referenced 23 Pa.C.S.A. § 4104 ("Right of married person to separate earnings"). ***See id.*** at 30; ***see also*** N.T., 9/22/17, at 4-5. Mary reasons that the court must have improperly relied on this statute, which concerns support obligations, to define the terms of the parties' contract. Although we agree

---

language to be clear and unambiguous. Indeed, Mary's argument is not that the terms were vague – thus necessitating factual hearing complete with parole evidence; instead, she claims the terms **were** clear and unambiguous in her favor.

that Section 4104 is immaterial to this claim, we do not agree that the trial court's citation to it underpinned its determination. [4]

Notwithstanding the lack of a trial court opinion, the basis for the court's decision is not a mystery. The court explicitly found Paragraph 2 and Paragraph 5 to be dispositive. On appeal, we review the court's self-evident determination that the terms of the Antenuptial Agreement were clear and unambiguous. Ultimately, we fail to discern either an abuse of discretion or an error of law.

In our review, Paragraph 1 is a backward-looking provision. It involves the disposition of property already in existence at the time of the contract's execution; that is, the property with which each person entered the marriage as specified in Schedule A and Schedule B. Paragraph 1 further addresses the appreciation, sale, or reinvestment of this property. Conversely, Paragraphs 2 and 5 are forward-looking provisions. They explicitly mention property acquired after the execution of the Antenuptial Agreement and it's future disposition in the event of a divorce. Both provisions specify that after-acquired property will be treated "with the same effect as if no marriage had been consummated between the parties."

---

[4] During the hearing, the court indicated Section 4104 was something the law clerk came across in apparent preparation for the hearing; the court then posed whether Section 4104 would have any impact on the matter. Mary's counsel immediately clarified that Section 4104 pertained to support matters and was immaterial to the instant case, and the issue was not addressed again.

On this point, Mary argues the "hereafter acquired" property mentioned in Paragraphs 2 and 5 refers not to just **anything** acquired after the marriage, but only to the appreciation, sale, or reinvestment of only the property contained in the Schedules, as outlined in Paragraph 1. **See** Mary's Brief at 29. This is the most persuasive argument she has, but Mary still fails to demonstrate how the court's opposite reading of these Paragraphs constituted an abuse of discretion or error of law. Therefore, we conclude the trial court did not err or abuse its discretion when it applied contract principles to determine the terms of the Antenuptial Agreement were clear and unambiguous, and that these clear and unambiguous terms meant Deedra's income would be separate, non-marital property.

In her next appellate issue, Mary argues the court erred when it adopted the master's alimony recommendation. Specifically, Mary argues the master misapplied the law for failing to consider her reasonable needs and Deedra's ability to pay. **See generally** Mary's Brief at 40-44. To begin, we observe that awards of alimony are within the sound discretion of the trial court and will not be disturbed absent an error or law or abuse of discretion. **Cook v. Cook**, 186 A.3d 1015, 1019 (Pa. Super. 2018) (citation omitted). Concerning alimony, we have said:

> Following divorce, alimony provides a secondary remedy and is available only where economic justice and the reasonable needs of the parties cannot be achieved by way of an equitable distribution. **Teodorski v. Teodorski**, 857 A.2d 194, 200 (Pa. Super. 2004) (citation omitted). An award of alimony should be made to either party only if the trial court finds that it is necessary to provide the receiving

> spouse with sufficient income to obtain the necessities of life. **Stamerro v. Stamerro**, 889 A.2d 1251, 1259 (Pa. Super. 2005). "The purpose of alimony is not to reward one party and punish the other, but rather to ensure that the reasonable needs of the person who is unable to support herself through appropriate employment are met." **Miller v. Miller**, 744 A.2d 778, 788 (Pa. Super. 1999) (citation omitted).
>
> "Alimony is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as the payor's ability to pay." **Teodorski**, [857 A.2d] at 200 (citation omitted).

**Cook**, 186 A.3d at 1019-1020 (quoting **Kent v. Kent**, 16 A.3d 1158, 1161 (Pa. Super. 2011)) (further citation omitted).

In determining "whether alimony is necessary and to establish the appropriate nature, amount, and duration of any alimony payments, the court is required to consider all relevant factors, including the 17 factors that are expressly mandated by statute." **Id.**, at 1020; **see also** 23 Pa.C.S.A. § 3707(b)(1-17) (footnote and citation omitted).

At the master's hearing, the parties stipulated that Deedra's monthly net income was $33,470 per month, and that Mary's gross earning capacity was $2,500 per month. Deedra was 60, and Mary was 58. The parties had been married for 39 years when they separated. Mary was a homemaker and the primary caretaker of the parties' now-adult child. The master further determined, **inter alia**, that the parties had a "very comfortable" standard of living during the marriage. **See** Master's Report and Recommendation, 11/1/19, at 16. Ultimately, the master recommended the following alimony award:

>(1)     Effective on the first day of the month following the entry of a final decree, [Deedra] shall pay [Mary] non-modifiable alimony in the amount of $5,700/month for a period of twenty-fourth consecutive months, or until the last day of the month in which [Mary] sells the [marital] residence […] whichever is earlier;
>
>(2)     Effective thereafter, until [Mary] reaches the age of 67, [Deedra] shall pay alimony to [Mary] in the amount of $3,500/month;
>
>(3)     Effective on the first day of the month after [Mary's] 67th birthday, [Deedra] shall pay alimony to [Mary] in the amount of $2,000 until the death of either party;
>
>(4)     After [Deedra] has paid alimony payments for seventy-two (72) consecutive months, said alimony payments shall be modifiable as to amount only upon a change in circumstances of a substantial and continuing nature; and
>
>(5)     Said alimony shall terminate upon the remarriage or cohabitation of [Mary] or the death of either party.

*Id.* at 21.

The crux of Mary's contention is her ability to remain in the marital residence. At trial, Mary submitted a budget with total expenses of $10,320 per month. She argues she has lived in the home for over two decades and has come accustomed to this lifestyle and standard of living, valid considerations under ***Teodorksi*** and Section 3707(b)(5) (the duration of the marriage), (b)(8) (the standard of living of the parties established during the marriage), and (b)(13) (the relative needs of the parties). ***See*** Mary's Brief at 42. Mary argues that requiring dependent spouses to move from their marital residences because they do not "need" to continue to live there would be a direct contradiction of established caselaw. *Id.* at 43. Mary notes further that

Husband's stipulated monthly net income - $33,470 – is more than sufficient to pay for monthly expenses necessary to retain the residence - $3,600. *Id.* at 44.

In response, Deedra reiterates that alimony is a secondary remedy, available only when economic justice and the reasonable needs of the parties cannot be achieved by way of equitable distribution and development of an appropriate employable skill. *See* Deedra's Brief at 16 (citing *Teodorski*, *supra*). Deedra notes Mary retained approximately $1,000,000 worth of assets following the divorce, including the marital residence, which has a stipulated amount of equity totaling $553,350.

More importantly, Deedra argues the master essentially made a credibility determination when determining that Mary's budget was overinflated. Indeed, the master determined Mary's vehicle expenses were "exaggerated," that her cost of health insurance was "significantly overstated," that $250 per week for groceries likely included the parties' son, that $2,600 per month for lifestyle expenses were "seriously inflated," that her $25,000 per year budget for vacations was "an aspirational figure," and that $8,000 per year for education and training was "a fictious expense." *See* Master's Report and Recommendation, at 18-19. Concerning the marital residence, the master determined:

> [D]oes [Mary] "need" to remain in an 11-room, 4-bedroom residence on nine acres of land? The answer is: no, not indefinitely, but yes, for the next couple of years during this litigation. The master understands that this is [Mary's] home and she feels safe and secure there. That being said,

it is simply too large for a single person on a permanent basis, which is why [Mary] has a cleaning service and a landscaping service. According to Wife's budget, the taxes, maintenance, and utilities alone are more than $3,600 per month.

*Id.* at 18 (footnote and superfluous capitalization omitted).

Our review of the record supports the trial court's adoption of the master's findings. We reiterate this Court will not find an abuse of discretion unless the law has been misapplied or the judgment exercised was "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." *See, e.g., Balicki v. Balicki*, 4 A.3d 654, 663 (Pa. Super. 2010) (citation omitted). We discern no misapplication of law, nor was the decision manifestly unreasonable. After all, Mary concedes the master properly examined the evidence and testimony relating to her alimony claim under the appropriate statutory factors. *See* Mary's Brief at 40. Of course, we understand Mary's argument, just as we could envision how the master might have reached a different result. And although Mary cites relevant legal authorities in her Brief, none supports her argument that the court abused its discretion. In essence, Mary seeks to relitigate her alimony claim before this Court after having been unsuccessful before the master and the trial court. Such is not within our purview.

In her third appellate issue, Mary argues the court erred when it failed to order Deedra to secure the alimony obligation to Mary. She cites the master's determinations that Mary needed alimony to meet her needs. Thus,

she reasons that security of that alimony is necessary in the event of Deedra's death. For support, Mary cites Section 3502(d), which provides:

> The court may direct the continued maintenance and beneficiary designations or existing polices insuring the life or health of either party which were originally purchased during the marriage and owned by or within the effective control of either party. Where it is necessary to protect the interests of a party, the court may also direct the purchase of, and beneficiary designations on, a policy insuring the life or health of either party.

23 Pa.C.S.A. § 3502(d).

Curiously, Mary also notes **Balicki**, **supra**, with an eye toward distinguishing it. In that case, we adopted the trial court's rationale for **denying** the obligee's request for alimony security:

> The [m]aster, however, did not recommend [h]usband [maintain a life insurance policy for the duration of] the alimony award, and [the trial court] denied [w]ife's exception concerning the issue. 23 Pa.C.S.A. § 3707 provides "…upon the death of the payor party, the obligation to pay alimony shall cease unless otherwise indicated in an agreement between the parties or an order of court." If [h]usband's alimony ceases at death, obviously [the trial court] would not require life insurance to secure an alimony obligation that does not exist. Considering the assets [w]ife is receiving in Equitable Distribution, the Alimony Pendente Lite she is receiving and her current employment, [the trial court] decline[s] to order that alimony continue in the event of [h]usband's death prior to [the termination of wife's award].

**Balicki**, 4 A.3d at 667 (quoting the trial court's Rule 1925(a) opinion).

Mary concedes the request for alimony security was denied in **Balicki**. However, she maintains the reason for the denial was so that the husband's

- 15 -

alimony payments would be deductible for federal income tax purposes. Thus, Mary reasons, because there are no longer the same tax consequences for alimony awards pursuant to the Tax Cuts and Job Act of 2017, the holding in *Balicki* does not apply.

We disagree with her characterization of our precedent. While the tax ramifications were at issue in other parts of *Balicki*, they were clearly not the basis for the denial of the wife's request for alimony security. As Mary provides no other authority supporting her position that the denial of her request for security constitutes an abuse of discretion, we conclude her third issue is meritless.

In her final issue, Mary argues the court erred when it adopted the master's recommendation to deny her request for counsel and expert fees. On this issue, we observe our well-settled standard of review:

> We will reverse a determination of counsel fees and costs only for an abuse of discretion. The purpose of an award of counsel fees is to promote fair administration of justice by enabling the dependent spouse to maintain or defend the divorce action without being placed at a financial disadvantage; the parties must be "on par" with one another. Counsel fees are awarded based on the facts of each case after a review of all the relevant factors. These factors include the payor's ability to pay, the requesting party's financial resources, the value of the services rendered, and the property received in equitable distribution.

*Anzalone v. Anzalone*, 835 A.2d 773, 785–86 (Pa. Super. 2003) (citation and paragraph break omitted); *see also id*. at 786 (stating that counsel fees are awarded only upon a showing of need). "In most cases, each party's

- 16 -

financial considerations will ultimately dictate whether an award of counsel fees is appropriate. Also pertinent to our review is that, in determining whether the court has abused its discretion, we do not usurp the court's duty as fact finder." ***Busse v. Busse***, 921 A.2d 1248, 1258 (Pa. Super. 2007) (citations and quotation marks omitted).

Instantly, the master explained the reasoning behind the denial as follows:

> Both parties have filed claims for counsel fees and expenses. [Mary's] claim is based upon having incurred over $180,000 in counsel fees and approximately $30,000 in expert fees during the course of the litigation. [Deedra's] claim for counsel fees, in the amount of $55,000, is due to [Mary's] challenge to the validity of the Antenuptial Agreement. As the Agreement does not provide for an award of counsel fees in the event that a challenge to the validity of the Agreement is not successful, [Deedra] seeks fees pursuant to 23 Pa.C.S.A. § 3105(a) and § 3502(e)(7). Counsel fees are awarded based upon the facts of each case after a review of all relevant factors. These factors include: the payor's ability to pay, the requesting party's financial resources, the value of the serves rendered, and the property received in equitable distribution. Counsel fees are awarded only upon a showing of need. ***Anzalone v. Anzalone***, 835 A.2d 773 (Pa. Super. 2003).
>
> The cross claims for counsel fees present a bit of a dilemma for the [m]aster, as the [m]aster can envision awarding fees to each party, but for different reasons. Without question, both parties were well represented by counsel. With regard to [Mary's] claim, her combined fees are in excess of $200,000. About a quarter of those fees were incurred due to [Mary's] challenge to the Antenuptial Agreement, which she was advised by her then-counsel not to sign. Moreover, according to [Mary's] testimony, she has been able to pay the majority of her fees on a monthly basis, utilizing the support being paid to her by [Deedra], with a balance due of $30,000-$40,000, which the [m]aster could recommend

- 17 -

that [Deedra] pay; however, the [m]aster finds that [Mary] can pay this balance with the cash being paid to her by [Deedra]. With regard to [Deedra's] claim for successfully enforcing the Antenuptial Agreement, such a request is completely reasonable, except for the fact that [Deedra's] financial situation, including [her] $5,000,000 separate estate, is far, far superior to [Mary's] financial situation. As such, the [m]aster recommends denying both parties' claims for counsel fees.

Master's Report and Recommendation, at 22-23.

On appeal, Mary reasons a fees award is warranted due to the dramatic difference in income and assets between the parties. **See generally** Mary's Brief at 48-51 (citing **Carney v. Carney**, 673 A.2d 367 (Pa. Super. 1996) (holding that consideration of the parties' relative incomes is appropriate in determining whether to award fees)).

In response, Deedra argues Mary seeks to double dip. Deedra notes she had paid interim support since the parties' separation in September 2016, as well as the expenses pertaining to the marital residence. She adds that, while the master concluded Mary had a balance of $30,000 to $40,000 in counsel fees, the master never found that Mary was in need. Deedra concludes by reiterating that Mary will receive lifetime alimony following the termination of her interim support arrangement, and that she has substantial liquid assets resulting from the equitable distribution of the marital estate. **See generally** Deedra's Brief at 24-25.

Upon review, we fail to discern an abuse of discretion or error of law. Importantly, we also observe that the trial court determined Deedra's interim support obligation must continue pending Mary's appeal. Although the cost of

- 18 -

litigation was high, and although we acknowledge the master's conclusion that Deedra was in a "far, far superior" financial situation, the same does not automatically warrant a resulting award for counsel fees. Beyond this, Mary cannot demonstrate how the court's discretion was abused, nor will we usurp the lower court's role as factfinder finder. Accordingly, we conclude Mary's final claim is without merit.

In sum: we conclude the trial court did not abuse its discretion when it interpreted the Antenuptial Agreement to mean that the parties' respective incomes were separate, non-marital property; and we conclude the court did not error or abuse its discretion when it adopted the master's alimony and counsel fees recommendations.

**497 WDA 2020**

Having disposed of Mary's appeal, we turn now to Deedra's. We begin with a necessary review the complex procedural history: After the master issued the report and recommendation, Deedra petitioned to terminate the interim support. While the petitions were pending, Mary filed exceptions to the master's report and recommendation. The court denied Deedra's petition without prejudice on November 13, 2019, granting Deedra leave to re-file the petition after the court adjudicated Mary's exceptions. The court adopted the master's report and recommendation and dismissed Mary's exceptions by the order of March 9, 2020. Mary appealed, and we disposed of that matter ***supra.*** Deedra also appealed from the March 9, 2020 order, but under the

- 19 -

notion that it finalized the November 13, 2019 order that denied her termination petition.[5]

On August 19, 2020, this Court issued a Rule to Show Cause as to why Deedra's instant appeal was not interlocutory under **Fried v. Fried**, 501 A.2d 211 (Pa. 1985) (issues in divorce are reviewable after entry of divorce decree and resolution of all economic issues) and **DeMasi v. DeMasi**, 597 A.2d 101 (Pa. Super. 1991) ("[W]hile [Alimony *pendente lite* (APL)] typically ends at the award of the divorce decree, which also should be the point at which equitable distribution has been determined, if an appeal is pending on matters of equitable distribution, despite the entry of the decree, APL will continue through the appeal process and any remand until a final Order has been entered.").

Deedra properly responded to the Rule, advancing the theory that Mary's exceptions – and resulting appeal – did not actually pertain to equitable distribution. Deedra reasoned, by the terms of the Bifurcation Order governing interim support, the parties' economic claims were resolved. We discharged the Rule to Show Cause and ordered Deedra to address the issue in her Brief.

Thus, Deedra's appeal concerns two issues. The first issue addresses whether her appeal is proper under **Fried** and **DeMasi**, per our instruction.

---

[5] Deedra eventually re-presented her termination petition, per the court's instructions. The court again denied Deedra's request on June 22, 2020, and she appealed. That appeal is separately listed before this panel. **See** 681 WDA 2020.

Her second issue address the substantive question of whether the trial court erred by refusing to grant her termination petition:

> 1. Whether the decisions in **Fried v. Fried**, 501 A.2d 211 (Pa. 1985) and **DeMasi v. DeMasi**, 597 A.2d 101 (Pa. Super. 1991) render the trial court's order of court dated March 9, 2020 interlocutory?
>
> 2. Whether the trial court manifestly abused its discretion by denying [Deedra's] petition to terminate interim support and institute master's alimony recommendation by order of court dated November 13, 2019, despite the master's report and recommendation have been issued and all hearings have been concluded?

Deedra's Brief at 3 (superfluous capitalization and parenthetical quotation omitted).

In her first issue, Deedra argues **Fried** and **DeMasi** are inapposite from the instant matter. As Deedra notes, **Fried** stands for the proposition that issues pending the final resolution of economic claims are interlocutory due to the ability of the trial court to offset any mistakes with the interim orders with equitable distribution:

> In the event that an initial award of interim relief is granted in error, the court has the power to make adjustments in the final settlement via the equitable distribution of marital property, permanent alimony, and/or the final award of attorney's fees and costs.

**Fried**, 501 A.2d at 215. In other words, there can be no finality in these interim awards to render them appealable, because there is no irreparable loss of a claim. **See id.**

Deedra distinguishes *Fried* by arguing that there was no equitable distribution between the parties, because that issue was resolved by the parties' Antenuptial Agreement. To the extent that equitable distribution was even before the master, however, Deedra further argues that Mary only filed exceptions to the alimony award and counsel fees – not the master's equitable distribution of whatever marital estate existed by virtue of the Antenuptial Agreement. Thus, according to Deedra, it follows that Mary's instant appeal does not involve equitable distribution at all, thereby rendering *Fried* – or, for that matter, *DeMasi* – inapposite. Notably, Deedra does not argue that our analysis should change, given that the source of her support obligation was from a consent order, and not a traditional alimony *pendente lite* award. *See Little v. Little*, 657 A.2d 12, 15 (Pa. Super. 1995) (holding that an alimony dispute must be resolved under contract principles where the source of the alimony was a consent order and not a court-ordered award).

In either event, we are not persuaded that Deedra's appeal is properly before us at this time. When Deedra took the instant appeal, the trial court had yet to formally adopt the master's report and recommendation of the equitable distribution of the martial estate. In that sense, economic issues were still pending before the trial court. It does not matter that Mary's exceptions only concerned alimony and counsel fees, as these matters were intertwined with equitable distribution as a whole; had the trial court granted Mary's exceptions, the master's equitable distribution scheme would have to be recalibrated and litigation at the trial court level would have continued.

Similarly, it does not matter that Deedra ostensibly appealed from the March 9, 2020 order, which adopted the master's report. Deedra only appealed the March order under the guise that it finalized the November 13, 2019 order denying her petition. Indeed, Deedra does not contest the March order adopting the master's report; she contests the November order denying her termination petition. Nor can we conclude that Deedra's claim would have been irreparably lost, because the trial court explicitly granted her leave to re-present her termination petition immediately after the court adjudicated Mary's exceptions (read: after the trial court finalized the equitable distribution award). And, of course, Deedra did re-present her petition on June 22, 2020, at which point the court reached the merits of Deedra's request to terminate support.[6] For the reasons stated above, we quash Deedra's appeal.

_____

[6] Regarding the June 22, 2020 hearing, we observe Deedra all but conceded that **this** appeal is improper. There, the parties addressed whether the trial court lacked jurisdiction under Pa.R.A.P. 1701(a) (Effective of Appeal Generally). Deedra argued that Pa.R.A.P. 1701(b)(6) provided the trial court with jurisdiction to adjudicate her second termination petition, notwithstanding the pendency of **this** appeal. **See** Pa.R.A.P. 1701(b) (the trial court may proceed further in any matter in which a non-appealable interlocutory has been entered, notwithstanding the filing of a notice of appeal). Deedra's counsel explained, "I think, Your Honor, that arguably the November 13 Order was interlocutory because you really didn't put me out of court. You said it could be re-presented. And so I do feel that there is jurisdiction [….]" **See** N.T., 6/22/20, at 6. In other words, Deedra virtually admitted to the trial court that the instant appeal was improper, even as she prepared to defend its propriety before this Court.

Of course, it must be noted that the parties' appellate litigation occurred as the gravity of the Covid-19 pandemic became apparent in the United States. *(Footnote Continued Next Page)*

The Order dated March 9, 2020 affirmed. Appeal 497 WDA 2020 quashed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/9/2021

---

We are cognizant of the procedural chaos created by the Covid-19 pandemic and the resulting judicial emergency. And we are sympathetic to Deedra's view – however misguided – that she had to take the instant appeal lest this Court or the trial court deemed the issued waived. Nevertheless, Deedra is ultimately correct; the November 13, 2019 order was interlocutory.